**HARROD v. UNITED STATES.**

No. 7616.

United States District Court
W. D. Washington, S. D.

Aug. 9, 1951.

Sam L. Levinson, of Levinson & Friedman, Seattle, Wash., for libelant.

Guy A. B. Dovell, Asst. U. S. Atty., Tacoma, Wash., for respondent.

McLAUGHLIN, District Judge.

This is an action brought by the libelant under the Public Vessels Act, 46 U.S.C.A. § 781 et seq., which makes applicable the Jones Act, 46 U.S.C.A. § 688.

I am satisfied here that the libelant is entitled to recover. I am satisfied that the testimony of the libelant as to conditions aboard this vessel is truthful and reliable testimony, particularly as it is supported by the testimony of the witness Morgan, who testified in open court, and the witness Feinman, who testified by deposition, both of whom at times slept or were quartered in the same room and slept on the same bunk, had the same troubles—terms of uncomfortable, damp, drafty, cold conditions —as the libelant described occurring when he lived in these quarters, particularly the second set of quarters aft on E-deck of the Usat General Leroy Eltinge.

I have seen fit to adopt the testimony of the libelant, who gives every indication of telling the truth and of not exaggerating, being very careful and precise, and of the witness Morgan, who testified in open court and as corroborated by the libelant's witness Feinman, who testified by deposition, and also corroborated by the respondent's witness who testified by deposition, the Second Steward Cullerton, and the witness Anderson. It might not be amiss at this point to refer to testimony of libelant's immediate superior Cullerton, the Second Steward, who stated that libelant was an excellent workman, dependable, always neat and clean, and a person of clean habits. Powers, the Chief Steward, testified that to his knowledge the man had no bad habits.

I find that the quarters to which libelant was first assigned on E-deck forward were occupied by him approximately three months, and that during the period of his occupancy the ventilation in these quarters was inadequate and it was not possible to obtain proper heat, and that by reason of the inadequate treatment with cork paint or other material on the bulkhead or skin of the ship moisture condensed therein and the general atmosphere of the room was drafty, cold and damp. That he moved from these quarters to others assigned him aft on the same deck.

I am satisfied that the conditions described by the libelant as obtaining in his room aft were even more unhealthy than the conditions which he described as obtaining in the room from which he moved and which was the first room occupied by him on E-deck forward.

I find from the undisputed record here that this young man—a citizen of African descent—was accepted by the Army Transport Service in 1949 after extensive examination by the respondent, including a chest X-ray, as a person in good health and suitable for handling food and thus he was employed as a waiter or steward aboard this vessel. The record of the history of his medical examinations previously to the one given to him at the time of his employment, indicated that he was in normal good health. However, I am satisfied from the testimony of the libelant, supported, as I have said, by the testimony of the witnesses whom I have named, that the libelant was adversely affected by the living conditions assigned to him aboard this vessel.

I find specifically that the heating and ventilating system was defective particularly with respect to the aft quarters on E-deck which this man occupied. I find that in this room the cork paint on the bulkhead or skin of the ship was inadequate to keep the moisture from condensing upon the wall or side of the ship and thus the condensed moisture caused the room to be continually damp.

I am further satisfied that this unhealthy condition was aggravated by a leak in a joint in a pipe overhead and above the libelant's top bunk on the inboard side of this room, which dripping elbow had not only made other occupants of this bunk uncomfortable and induced them to move whenever another bed became vacant, but in this particular instance especially made this libelant uncomfortable and interfered with his ability to sleep and made him restless and caused a loss of sleep and the fact that the bedding became damp and wet and uncomfortable despite his continual changing of the linen and blankets.

As previously mentioned, the ventilators overhead in this room were above the libelant's bunk, which I am now describing.

The ventilating system was inadequate in that it was not possible, due to its defective conditions, for these outlets in this room to regulate either the heat or the cold and, consequently, more or less continual draft was upon the person occupying this upper bunk.

I further find that it was not possible for the libelant to move from this bed until such a time as a bed elsewhere became available, and that when such did happen the plaintiff did move to another bed in this aft room and still later moved entirely from the room to a smaller room in the Cooks' Department.

I find that the libelant and prior occupants of this bed and of the quarters fore and aft which the libelant occupied had previously complained about the ventilating condition—about the dampness, which was corroborated by the testimony of the Second Steward Cullerton, but that despite routine inspections nothing was done about the complaints nor was anything deemed to be out of order by these routine inspections. It was, of course, the rule of the master of the ship that for inspection purposes the rooms be tidied up. Consequently, on the occasions of inspection they looked neat and clean for the floor of this particular aft quarters had been mopped up, and thus the condensed water from the walls had been taken care of for the purposes of inspection and the defect, in the Court's opinion, was not then and there particularly noticeable, nor was the dripping of the elbow of the pipe over the libelant's bunk.

Turning to the respondent's case, I want to say that I am accepting the libelant and his two witnesses' testimony and not accepting the testimony of the Government's witnesses, particularly the two Captains of this vessel during the time the libelant was a steward aboard this vessel, because I am satisfied that the bulk of the respondent's witnesses, and as attested by them generally, have little specific recollection of the conditions, if they had known them originally, which obtained in the quarters that the libelant occupied. As to the officers generally, they, too, took more or less of a defensive attitude with respect to their ship

being in first-class condition, which is an understandable attitude. The inspections that they refer to were, I am satisfied, pretty much routine affairs and only the big things that stood out like sore thumbs were tended to or accorded treatment when in need of repairs.

When we come down to specifics, particularly the two witnesses of the libelant, I find that the two men, Morgan and Feinman, who previously lived in this room and bunked aft prior to the libelant's occupancy of the top bunk—the second room—evidenced convincing knowledge of what they were talking about and so too generally does the Second Steward Cullerton, whose business it was to come in direct contact—have general direct charge of the stewards.

As to Captain MacMillan, he satisfied me as being a very truthful witness, except that his testimony is very general, for that reason lacking specific detail as to the situation which is here in issue. That is why I dismiss his testimony as interesting but as of no significance or aid to the Court in solving this problem.

Clearly, as to Captain Buffet, I think actually that Captain, due to his zealousness to defend the ship, has overplayed his hand and has done the Government's case substantial injury, for an inspection of his testimony will reveal serious conflicts. For instance, he talks about all four walls of the quarters occupied by the plaintiff on E-deck aft to be covered with cork paint and everybody else testifies that only the skin or bulkhead wall, which was to the water, was covered with such paint and was the only wall in need of such paint. Further, this same Captain testified that the ceiling was covered with glass insulation, and that just is not so. It may be that the Captain has been on too many ships and is confusing his ships.

There was another conflict in his testimony with that of other Government witnesses that shows he may be confused as to his ships. The Chief Engineer Godfrey, who testified in open court, testified that this ship was built for Navy transport and to give the greatest protection the ship was built in sections or compartments, which were isolated one from the other. Because

of the construction of the ship to provide the utmost safety, each section, and there were a great many sections, had its own heating and ventilating system, with the heat coming from above, whereas the Captain—I think that he is confused as to his ships—actually tries to have us believe that this was not the case, that there was a ventilating system of a different nature aboard the vessel, being a single system with the heat coming from below, and it was so perfect that the people way down in the bottom of the ship got better ventilation and better heat than he did. Powers, the Chief Steward, testified that the ship was heated by many different systems, which operated independently from each other. Nor does the Captain's testimony accord with the testimony of the First Officer, who said that the heat was defective and he had to turn on the radiator in his room to get adequate heat. So for the reasons given, and there are others that you can find in the testimony of this Captain, his testimony is not worthy of credence. Throughout his testimony, there are exaggerated statements which satisfy me that the testimony of that Captain is not such as to bear much, if any, weight, when you come to consideration of the specific details.

Under these conditions the libelant's testimony is to the effect, and I find nothing not worthy of belief in this regard, that his sleep, as I said, was interfered with and broken, and as a consequence of loss of sleep his resistance became low and despite no prior traits or history or indication of tuberculosis as a result of these conditions, his resistance lowered aboard this vessel in the short space of six months—June to December—and this libelant contracted an acute case of tuberculosis.

I am accepting the finding, in accordance with the testimony of Doctor Narodick, who testified for the libelant, that lowered resistance is one of the principal causes, if not in his opinion the principal cause, of persons being susceptible to infection, either from within or without, to tuberculosis bacilli, and that in this instance under the conditions as described by the libelant and as found as true by the Court, the doctor says those conditions could well have re-

sulted and did result in this man contracting tuberculosis. Dr. Nelson, called by respondent, also testified that the physical conditions testified to by libelant could be the cause of his tuberculosis condition. That can be medically said, as well as legally said, as it now is, that those conditions are the cause which is responsible for the libelant acquiring this dreaded disease of tuberculosis.

So that I find in point of fact and in point of law the ship to be responsible for this man's condition in that his living quarters were defective. The ship had a duty to provide him with suitable living quarters which were dry and properly ventilated and heated, and for its failure to do so, the ship is responsible.

I should mention that Dr. Nelson, the respondent's witness, points out, and I am in accord with his finding, that for some reason persons of African descent are more susceptible to tuberculosis than persons of the white race.

Doctor Nelson pointed that out, and it is no defense here to say that others sleeping in the room did not contract tuberculosis.

The respondent here took the libelant into its employ in his then condition after satisfying itself of his condition by a complete physical examination, and if due to conditions his resistance became lower to a point where he was a tuberculosis victim— if the ship's conditions are the cause of that lowered resistance which brought about a tubercular condition, then the ship is responsible.

■ We pass now to the matter of what is the situation as to the future and what damages should be allowed. From that point I am not in accord with Doctor Narodick. Doctor Narodick is not entirely satisfied that the tuberculosis disease in the libelant's right lung in the two lower lobes has been arrested. In the X-rays here in the record he sees some shadows which indicate to him that the disease may be progressing, and despite the very serious thoracoplasty operation which has been performed on this libelant to collapse the upper lobe of his right lung, he believes that future trouble in this area of the lower lobes of the lung might be expected by the libelant.

This same doctor also sees a shadow in the left lung which indicates to him that maybe sometime in the future trouble may develop in that lung. Without indicating in any way that the doctor hasn't a basis for his thoughts, I am inclined nevertheless to accept the opinion of Doctor Nelson with respect to this condition that there is not an adequate showing from these X-rays that the disease is progressing. I am satisfied that it has been arrested in the right lung; at least it has not been shown to be progressing.

As to the left lung, the libelant is making no claim as to that. But just by way of parenthesis, I don't think that trouble is there indicated. There might be a suspicion but, as Doctor Nelson says, it is a very meager suspicion at this moment. So, on that score I accept Doctor Nelson. I also accept Doctor Nelson's testimony on the point that despite this very serious operation on the right lung the libelant is not as to the future a completely disabled individual. It is true that heretofore he was a person who, with his eleventh grade education, did rather hard manual work in the form of being a steward or waiter and that it is quite certain as to the future he will never be able to work that hard with his hands because of this operation. But it is also true that he is a rather alert man of thirty, who can turn to and learn a new means of livelihood which accords with his present physical condition. Doctor Nelson testified that he could be rehabilitated and learn some occupation commensurate with his impaired physical condition.

■ Previously he earned approximately $2240 a year as base pay as a waiter, plus overtime, making a total of $320 a month. The question now remains as to how much should be allowed him by way of damages. Taking into consideration the testimony of the doctors as I have outlined it and in accordance with my finding, taking into consideration the annuity tables and the present value of his loss of earning capacity, and the fact that this man has a life expectancy as of this time of thirty-five years-plus, and considering the present worth of the dollar

and the available rate of interest at this time, and in considering also the element of pain and suffering that this man has suffered and will suffer as a result of this serious operation, and the disfiguring scar on his back and chest from the thoracoplasty operation which makes immediately apparent that part of his lung is gone from tuberculosis and carries with it the stigma of tuberculosis, the fact that he has been in the hospital for almost two years as a bed patient, and will be a hospital patient for at least another year, probably more, and that according to the testimony there will be at least two years after he leaves the hospital before he will be able to go into any gainful occupation, while he attempts to rehabilitate himself—I am inclined to think that he would be adequately compensated for his injuries by the sum of $30,000.

So, those rambling reasons when fitted together give conviction to my mind that the plaintiff is entitled here to recover on his amended complaint in the sum of $30,000, and I will sign findings of fact and conclusions of law consistent with this opinion.