BRADT

v.

UNITED STATES et al.

No. A–18786.

United States District Court, E. D. New York.

May 27, 1954.

Harry D. Graham, New York City, for libelant.

Leonard P. Moore, U. S. Atty. for the Eastern Dist. of N. Y. and Burlingham, Hupper & Kennedy, New York City (James W. Lynch, Robert B. Pohl, Brooklyn, N. Y., of counsel), for respondent.

Foley & Martin, New York City (Christopher E. Heckman, Edward J. Ryan, New York City, of counsel), for respondent-impleaded.

BRUCHHAUSEN, District Judge.

The libelant, William F. Bradt, seeks to recover damages against the respondent, United States of America, both under the Jones Act, 46 U.S.C.A. § 688, and the general maritime law for unseaworthiness of the vessel, Pittston Victory, and for maintenance and cure. Libelant had been employed as an assistant engineer on the vessel from March 1945 to April 1946. He claims that he was burned and scalded during the performance of a hydrostatic test in the engine room of the vessel and also contracted tuberculosis, due to the alleged unseaworthiness of the ship. The respondent, Cardinal Engine & Boiler Works, Inc., conducted the hydrostatic test and was impleaded as a party in this proceeding.

■ It seems appropriate to first consider the libelant's claim for injuries in connection with the hydrostatic test. It appears that on February 4, 1946, the chief engineer of the Pittston Victory requested the libelant to observe some tests being made by the impleaded respondent, Cardinal Engine Company. The said impleaded respondent was then in the process of completing repair work on a condenser on the vessel. A tarpaulin was placed on the motor near the condenser to protect it from any water which might come from that part of the condenser which was left open so that the test might properly be observed. The libelant went below and entered the testing area. Upon his entrance, he then, without a word or question addressed to the men in charge of the test, walked over to the tarpaulin, bent down, and ripped it off. At that precise moment, he was scalded by steam and hot water which appears to have gushed forth from the opening, meant to aid observation.

The testimony reveals that he knew scarcely anything about the procedures used in these tests. He knew that either hot or cold water could be used in them, yet he knew nothing of the procedures in this one. He was conscious that there was a good purpose for the placing of the tarpaulin. It appears to have been there to keep just such escaping water from the adjacent motors. Upon ripping off the tarpaulin, the libelant placed himself in the exact area to be protected from this specific occurrence viz.: water escaping from the opening deliberately left that way for the observation of the test, and falling upon the adjacent area occupied by Bradt.

There is no evidence that the test was improperly or uncustomarily rigged so as to constitute a hazard for even the untutored who might come upon the scene, much less a maritime engineer placing himself in a hazardous position.

There is no negligence on the part of the impleaded respondent, Cardinal Engine Company or of the respondent, United States. The accident was caused solely by the negligent acts and unwarranted interference of the libelant.

In connection with the libelant's cause of action for damages for contracting tuberculosis, the respondents contend that it is untimely because the libel was filed on April 10, 1948, allegedly more than two years after the cause of action arose. The Suits in Admiralty Act, § 5, 46 U.S.C.A. § 745, prescribes a two year limitation for such actions.

The respondents contend that the cause of action must have arisen earlier than April 11, 1946, for the reason that some of the symptoms such as jumpiness, colds, tiredness, nervousness, coughing, weight loss and sweating all were manifest to the libelant before he had specific knowledge that it was tuberculosis, thus putting him on notice as to an invasion of his legal rights. Thus, it is argued, since all of those symptoms were manifest prior to April 11, 1946, his action must be deemed barred. Such reasoning is clearly contrary to judicial precedent.

■ The case of Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282, is the genesis of all cases dealing with this problem. An analysis thereof brings the problem into proper perspective. In that case, the plaintiff, a locomotive fireman, contracted silicosis as a result of inhaling silica dust. It was al-

leged that since he had inhaled silica dust since 1910, his cause of action must have accrued prior to 1938, thus barring his suit, begun in 1941, since it was in excess of the three year statute of limitations under the Federal Employers' Liability Act, 45 U.S.C.A. § 56. The Court in that case wrote, 337 U.S. at page 169, 69 S.Ct. at page 1024, 93 L.Ed. 1282:

" * * * such mechanical analysis of the 'accrual' of petitioner's injury—whether breath by breath, or at one unrecorded moment in the progress of the disease—can only serve to thwart the congressional purpose.

"If Urie were held barred from prosecuting this action because he must be said, as a matter of law, to have contracted silicosis prior to November 25, 1938, it would be clear that the federal legislation afforded Urie only a delusive remedy. It would mean that at some past moment in time, unknown and inherently unknowable even in retrospect, Urie was charged with knowledge of the slow and tragic disintegration of his lungs; under this view Urie's failure to diagnose within the applicable statute of limitations a disease whose symptoms had not yet obtruded on his consciousness would constitute waiver of his right to compensation at the ultimate day of discovery and disability."

The Court in that case, continuing, 337 U.S. at page 170, 69 S.Ct. at page 1025, wrote:

"We do not think the humane legislative plan intended such consequences to attach to blameless ignorance. Nor do we think those consequences can be reconciled with the traditional purposes of statutes of limitations, which conventionally require the assertion of claims within a specified period of time after notice of the invasion of legal rights. The record before us is clear that Urie became too ill to work in May of 1940 and that diagnosis of his condition was accomplished in the following weeks. There is no suggestion that Urie should have known he had silicosis at any earlier date. 'It follows that no specific date of contact with the substance can be charged with being the date of injury, inasmuch as the injurious consequences of the exposure are the product of a period of time rather that a point of time; consequently the afflicted employee can be held to be 'injured' only when the accumulated effects of the deleterious substance manifest themselves * * *.' Associated Indemnity Corp. v. Industrial Accident Commission, 124 Cal.App. 378, 381, 12 P.2d 1075, 1076."

The respondents attempt to distinguish the case of Urie v. Thompson, supra, on the restricted ground that the nature of silicosis was unknown and inherently unknowable and that its symptoms had not yet obtruded on the plaintiff's consciousness. It is argued that the symptoms of tuberculosis were not as deceptively hidden as those of silicosis, but rather had obtruded upon the consciousness of the libelant, and had given him notice of the invasion of his legal rights. An analysis of this contention in the light of the guideposts in Urie v. Thompson will reveal how each case must stand on its own facts.

Just as the Court rejected the "breath by breath" theory in silicosis cases, this Court must reject the "symptom by symptom" theory advanced herein. Each symptom by itself is nothing but a stepping-stone in the direction of the true manifestation of the ultimate disease. It is true that the whispered warnings of approaching tuberculosis are more audible than the silent disintegration resulting from silicosis. But they, too, are the result of a condition over a period of time, rather than a point of time. It is not the symptom qua symptom that is the test. It is the symptom qua notice of the ultimate right, or notice of the duty to understand the composite maturity or ripening of the claim. It is not causes of action for the colds, coughing.

jumpiness, nerves, etc., which is the test. The test is when the claimant is no longer blamelessly ignorant of the fact that the occurrences obtruding on his consciousness are those of the particular cause of action, of the disease contracted, for which he seeks indemnity. The test is not the appearance of each subjective symptom or even a group of symptoms which may warn the tutored that tuberculosis may be developing. The fact that these subjective matters later manifested themselves as objective symptoms of the onslaught of the disease as viewed in retrospect is of as little import as the fact that they may have secretly ripened into tuberculosis at a time which might be barred by the statute.

■ There are no facts in the case at bar which place the libelant in such a position that he should have drawn any inference of tuberculosis from those "symptoms" which intruded upon his consciousness at the time of each individual intrusion. If he continued blamelessly ignorant of the ultimate manifestation of tuberculosis, see James v. Pennsylvania R. Co., D.C., 101 F.Supp. 241, 242, his cause of action would not arise until he became aware of his tubercular condition. Allen v. United States, 9 Cir., 201 F.2d 263, 264, certiorari denied 345 U.S. 957, 73 S.Ct. 939, 97 L.Ed. 1378. Such knowledge is a question of fact. James v. Pennsylvania R. Co., 3 Cir., 196 F.2d 1021. There is no reason to suppose that the libelant should have known he had tuberculosis prior to its diagnosis, which was within the statutory period. This Court finds that the cause of action arose at the time of such diagnosis.

■ The libelant claims unseaworthiness of the vessel Pittston Victory, in that deficiencies in the crew forced him to work far in excess of eight hours a day in capacities for which he was not qualified, resulting in a strain on his health. This Court finds that there was no deficiency or disability in libelant's lungs or general physical condition before he became a member of the crew of the said vessel. The credible evidence is to the contrary.

In March of 1945, libelant was transferred from the vessel, J. L. Luckenbach to the Pittston Victory in the capacity of 3rd assistant engineer. He served thereon until April of 1946, and made seven voyages during that period. When libelant joined the Pittston Victory, she was a new ship and carried cargo for the first lap of her first voyage. On her return therefrom, she was converted into a troop ship. For the six subsequent trips, she carried approximately 1500 troops on each lap of her trip between America and Europe.

The chain of events which led to this action began in November of 1945. The first assistant engineer became intoxicated and failed to report for duty. The libelant spent most of the night performing his duties in readying the ship for voyage No. 4. On the following morning, the chief engineer discharged the first assistant engineer, and designated the libelant as "acting" first assistant engineer, although he possessed a license qualifying him for the lesser position. The third assistant engineer, licensed only for that position, was then made "acting" second assistant engineer, and assumed the position, originally intended for libelant. The fourth assistant engineer, possessing a license as third assistant engineer, was promoted to third assistant engineer. An unlicensed seaman was made acting fourth assistant engineer.

The second, third and fourth assistant engineers were to stand watch. The fourth assistant engineer was to stand the 4:00–8:00 watch, the third was to stand the 8:00–12:00 watch, while the second was to stand the 12:00–4:00 watch. The first assistant engineer (in which capacity Bradt acted) usually performed so-called "day work", from 8:00 a.m. to 5:00 p.m., with the exception of Saturdays when he worked until noon. On Sundays, he would be off duty. He is generally not considered a watchstanding officer.

· Thus, when voyage No. 4 began, the only watch-standing licensed personnel of the engine-room staff, were two third assistant engineers. The chief engineer, though qualified, never stood a watch on the Pittston Victory, and the only one qualified to stand watch, for his respective duty, was the third assistant engineer.

The Court is convinced that the libelant, Bradt, suffered tuberculosis as a result of the pattern of overwork enforced upon him because of the consistent undermanning of the vessel. Furthermore, the vessel was unseaworthy and constantly breaking down. The libelant was, to all intents and purposes, the entire engineering staff of the Pittston Victory.

When voyage No. 4 began (after the discharge of the first assistant engineer), the libelant had multitudinous duties compounded by the necessity of watching, teaching and, indeed, performing the work of his subordinates. In addition to such daytime duty work activities as supervising repairs and getting the necessary inventories and crew, he had to watch the engine room staff. Indeed, prior to sailing on voyage No. 4 he had to aid the "acting" second assistant through the entire evening in the performance of his duties, which he was unable to carry out alone. While the ship was at sea, he had to stand the 4:00–8:00 p.m. watches with the unlicensed and inexperienced fourth assistant engineer. During the watches of the acting fourth and second assistants (when he was not on watch), his sleep was constantly interrupted by plant breakdowns which the others were incapable of handling. Troubles began with the auxiliary condenser, the main feed pump and the evaporator, requiring libelant's constant attention. At repeated intervals he was called upon by the Transport Commander to repair heating, lighting and ventilation equipment at all hours of the night. No new toilet or shower facilities were installed after the conversion to troop carrying operations, and the condition of the ship during the voyages leaves much to be desired in the way of care of

seasick service men. When something had to be done, anything, Bradt, and only Bradt, appeared to be the man for the task.

Voyage No. 5 commenced in January of 1946, whereon the resigned third assistant engineer was replaced by William Madsen, who was also qualified. It appears that a new acting second assistant replaced the former "acting" second assistant, and a new fourth assistant engineer with, however, a third assistant engineer's license, replaced the fired "acting" fourth assistant. Libelant, as in voyage No. 4, was designated as acting first assistant engineer. (It will be recalled that he was qualified as second assistant engineer but was made acting first assistant engineer for voyage No. 4). On voyage No. 5 he once again had to stand night watches for about a week with the new fourth assistant. There were the same troubles as on voyage No. 4. Libelant was beset with the main turbo feed pump, air compressor trouble, and the constant night calls. The same situation prevailed on voyage No. 6, at which time he requested leave from the ship, and it was denied since the chief, with seniority, was given priority of leave. Voyage No. 7 was a repetition of the same situation, complicated by a fire, requiring around the clock repair activities on Bradt's part. All of these unshared strains, the innumerable plant breakdowns, the interrupted sleep, coupled with limitation of facilities, permitting only one shower a voyage (by order of the chief), all contributed to and set the stage for, a tubercular condition which was contracted and became active during libelant's employment on the Pittston Victory. The testimony reveals considerable recorded overtime unnecessary to detail. The more important point is the constant interruption of sleep and overtime work, unrecorded, which placed a great strain on the libelant. The overwork enforced upon libelant because of the unqualified crew, the constant interruptions of sleep, the watches, and the continual breakdowns which he alone could repair, undermined the libelant's

health. The libelant attempted to protest his earlier appointment as acting first assistant engineer wherein he had signed on as a watch-standing second assistant engineer. The vacancy could have been filled before sailing. It is of little moment since to require protest would be a resuscitation of the doctrine of "assumption of risk", something which is in direct antithesis to the purposes of the act. The libelant was named as acting first assistant by the chief because he was a good man and no effort was made to replace him. Indeed, Bradt was so heavily relied on, that the chief himself testified that he was in reality always on the job as far as readying the plant was concerned, all in addition to his regular "daywork".

Libelant was in the engine room during all maneuvers. This is not customary. Indeed, the chief testified that he wouldn't trust the other engineers for that work for more than one-half hour at a time.

█ It is no answer to the claim of unseaworthiness of a vessel, through deficiency in crew, thus placing a burden upon one man, that he did not seek overtime for every unrecorded screw turned or bolt tightened after hours. The duty of shipowners to seamen, who are wards of admiralty, is not so lightly discarded by either the failure to record each period of overtime or a willingness to continue with his tasks. The fundamental test is whether the fact pattern establishes that the unseaworthiness of the vessel, including insufficiency of the crew, placed a great burden upon libelant. Not only must the crew be qualified in numbers and competency in accordance with 46 U.S.C.A. § 222 but they are not required or permitted to labor in excess of 8 hours in one day except in an emergency 46 U.S.C.A. § 673. There was no emergency here, but a situation over an extended period of time which should not have been permitted.

The proximate cause of libelant's illness was the inability of the crew to perform their normal tasks which called for the constant drain upon libelant, and justifies the same result as in the case of Boboricken v. United States, D.C., 76 F. Supp. 70 and Harrod v. United States, D.C., 99 F.Supp. 577, even though the sleeping quarters in the case at bar were sufficient. See the cases referred to in Henson v. United States, D.C., 88 F.Supp. 148, 149.

The Court was impressed with the libelant's forthrightness, intelligence. bearing, and, most important, his credibility. He was a conscientious young man, aboard a ship, insufficiently manned and constantly breaking down. When faced with added responsibilities, he first declined, but then went ahead and assumed them. He rarely, if ever, received aid from the chief engineer. All he received was duty compounded upon duty, interrupted sleep, hours of excessive labor, and orders from Troop Commanders who wanted better lighting, better heating, more air, etc. It was, indeed, a case involving labor on the libelant's part which was as excessive in time as it was upon the capacities of libelant.

█ The Court now comes to the question of damages. With respect to the cause of action for maintenance and cure, the Court finds, that libelant is entitled to the sum of $420 for the period from April 11, 1946, the date he left the ship, to June 20, 1946, the date he entered the Gaylord Farm Sanatorium.

The Court also finds that the libelant is entitled to the sum of $2,190 for maintenance and cure for the period from August 31, 1947, the date of his discharge from the Gaylord Farm Sanatorium, to September 1, 1948, the date he returned to Maritime School, which this Court finds is the date of maximum cure.

█ With respect to loss of wages, this Court finds that Bradt's advancements which were predicated on the absence of his superiors, the manpower shortages, the exigencies of the journeys, Cf. Boboricken v. United States, D.C., 76 F.Supp. 70, 74, causing his assumption of unusual duties beyond

his qualifications, all taken into account with the loss of active life, entitles him to compensation in the sum of $13,000. This is especially so since the Court finds that the nature and compensation for his reemployment after September 1, 1950, in the field of maritime architecture and engineering has vitiated any future earning losses based on any prior illness.

This Court finds that libelant is entitled to the sum of $2,000 for pain and suffering.

Judgment for the sum of $17,610, with costs is granted in favor of the libelant, and the libel against the Cardinal Engineering Company is dismissed. Submit findings of fact and conclusions of law, with decree.