**WALKER v. UNITED STATES.**

United States of America,
S. D. New York.
March 29, 1951.

**GODDARD, District Judge.**

This is a suit by the administrator of the estate of James H. Walker, a seaman who was killed while a torpedo net was being jettisoned from the S.S. William B. Wilson, a vessel owned by the United States and operated by the War Shipping Administration.

The libel alleges that the libelant's intestate was not provided with competent officers and coworkers; that libelant's intestate was not provided with a safe place in which to work; that the jettisoning operation was performed and supervised in a negligent manner.

The Navy had equipped the Wilson with two torpedo nets as a protection against torpedoes and had installed four booms for handling the nets—two forward and the two aft, one on each side of the vessel. The nets were made of heavy wire and were some 300 feet long and 60 feet wide. When not in use, they were lashed to the after booms. In rigging the net, the booms were lowered so that the net cleared the side of the ship. The net was then drawn out on a wire running from the aft to the forward boom. Then the booms were lowered further to an angle of about 90°, dropping the net into the water. When the net was so rigged, there was a space of several feet between the vessel and the net which was stretched along the side of the vessel. It served to catch torpedoes and prevent them from coming in contact with the vessel.

When the Wilson left Calcutta, India, bound for Colombo, Ceylon, in May, 1945, the nets were wrapped around the after booms. The master, allegedly under orders to jettison the nets somewhere beyond the 100 fathom bank at his discretion, decided to jettison them the afternoon of July 12, 1945—the third day out of Calcutta. The ship was stopped but was rolling and pitching after a two day storm. It was while the first net [the port net] was being jettisoned that the decedent was killed.

The two forward torpedo booms and the guy wires for the two after torpedo booms had been removed before the ves-

Benjamin B. Sterling, New York City, Seymour W. Miller, Betty H. Olchin, New York City, for libelant.

Irving H. Saypol, U. S. Atty., New York City, Tompkins, Boal & Tompkins and Arthur M. Boal, all of New York City, for respondent.

sel left New York. The master testified that without guy lines for the after booms it was impractical to use the boom to lower the net over the side of the ship as the boom could not be controlled and it would be free to swing fore and aft.

The jettisoning was done in the following manner: A wire cable, attached to the net and supporting it, ran from the net up to a block on the top of the boom and from there down to a cleat on the bottom of the boom. A stopper was put on this and the cable was run through a heel block on the bottom of the boom to a winch. When the slack had been taken up on the cable, the stopper was removed. The winch then held the net. The lashings were then removed from around the net and the net hung from the top of the boom. The boom was 8 or 10 feet from the ship's rail.

There was a solid bulwark around the deck except that opposite the booms there was a space where, instead of the solid bulwark, there were two stanchions through which a chain was strung. While the net was being jettisoned, the chain was removed.

There was a sharp conflict in the testimony of the witnesses for libelant and those of the respondent as to whether the stanchions were removable. Libelant's witnesses testify that they were removable; respondent's that they were not. The weight of this testimony was so evenly balanced that libelant has not proven by a fair preponderance of the evidence that the stanchions were removable.

In the process of jettisoning, the net was slowly lowered by the winch. It caught several times on the stanchions and some members of the crew, including Walker, were ordered to get under it and push it over the stanchions. When about one-half of the net had been lowered over the side, it again became caught and the men were ordered to go underneath the net and push it over the stanchions. While the men were under the net attempting to push it over the stanchions, part of the net, which the master said had "fouled up in some way which I can't explain", suddenly unrolled and dropped a distance variously estimated as 8 to 30 feet, striking Walker, who was under the net helping to push it over the stanchions, and knocking him overboard and causing his death. The fouling was apparently caused by some of the meshes being entangled. The master testified "that as the net was bunched up you could not see whether it was jammed or not." The net had previously been drawn together and lashed to the boom in such a manner that the meshes entangled or "fouled", as the master described it. Since the net might suddenly be shaken loose, it was dangerous for men to be working underneath it. As the ship was rolling and pitching, there was a real danger of this happening. The master himself realized that it was not safe to be underneath the net. He had warned the men not to stand under it as it was lowered but when the net, while being lowered, caught, on the stanchions, they were ordered to go underneath and push it over the stanchions.

I think respondent failed to use reasonable care for the safety of the men and that they were not provided with a safe place to work. The master said that he decided to jettison the net to increase the speed of the ship, although he admits that the increase would not be more that a quarter to half a knot. If the guy lines which the master claimed to be necessary for rigging the boom and lowering the net over the side were not on board the ship, rather than subjecting the crew to the unnecessary danger of the method adopted by the master, the jettisoning of the net should have been deferred until lines were available. At least, greater precaution should have been exercised in the plan the master attempted to use.

Respondent moved to dismiss the suit on the ground that Public Law 17 had not been complied with. The libelant made a motion to amend its libel by adding allegations that a proper claim

was served pursuant to Public Law 17, 50 U.S.C.A. Appendix, § 1291 and that the libel herein was instituted after the claim had been administratively disallowed in that no answer to his claim was received by the libelant within sixty days. Libelant's motion was granted but respondent's was denied. There was no showing by the respondent of hardship or surprise; The amendment did not add a new cause of action. It merely served to conform the pleadings to the proof.

The respondent asserts that the libel should be dismissed on the ground that the claim submitted by the libelant did not meet the requirements of Section 304.24 of General Order 32, 8 Fed.Reg. 5414, because it did not give the decedent's home address, date of birth, place of birth, and certificate of identification number.

However, this section does not specify any specific form of claim nor does it require that any specific information be included in the claim. The claim did contain the name of the libelant, the name and address of his proctor, the name of the decedent, the vessel, the date of the accident, a brief account of the accident, the alleged grounds of liability, and the amount desired in settlement. I think this information was enough. The respondent itself had access to any additional information it might have needed both as to decedent and the accident. McInnis v. United States, 9 Cir., 152 F.2d 387.

Respondent cites Rodinciuc v. United States, 3 Cir., 175 F.2d 479, certiorari denied 338 U.S. 895, 70 S.Ct. 234, 94 L.Ed. 550, in support of its contention that Public Law 17 has not been complied with. However, it appears from an examination of the opinion and the record in the Rodinciuc case that the facts in that case differ materially from those in the case at bar and that case is not applicable here.

The damages recoverable for death are purely compensatory; that is, the amount of the pecuniary loss suffered because of the death of the seaman. 46 U.

S.C.A. §§ 688, 761, 762; Johnson v. Griffiths S.S. Co., 9 Cir., 150 F.2d 224; Batkiewicz v. Seas Shipping Co., Limited, D.C., 66 F.Supp. 205.

At the time of the decedent's death, the decedent was 17 years of age and unmarried; his father was 51 years of age and his mother 43. The parents had an average life expectancy of about 23 years which, of course, was shorter than that of the decedent at the time of his death. The father is disabled—a war veteran receiving a government pension of $77.-20 per month. The mother was unemployed.

It is impossible to compute with mathematical certainty the pecuniary loss to the parents of a son who was earning good wages and generously contributing to the support of his parents. Marriage or increased personal needs might reduce his contributions. On the other hand, as he matured his earnings might increase.

For the first 7 months of the 9 months preceding the decedent's death, he contributed about $178 a month to the support of his parents. After his death, there was turned over to the parents about $335 which he had earned at the approximate rate of $175 a month during his slightly less than two months service aboard the Wilson.

In estimating the amount which the parents would have received had he lived, it would be assuming a highly improbable assumption to assume that all during his parents' lifetime he would have given all his wages to them. Even in view of his known generous provisions for the support of his parents, it seems reasonable to conclude that he would not have contributed more than $135 per month or $1620 per year. The present value of an annuity of $1620 per year for the life expectancy of the parents discounted at 3 per cent is approximately $26,650.

A decree may be entered for this amount.

Libelant will serve upon notice proposed Findings of Fact and Conclusions of Law.