**LAMON**
v.
**STANDARD OIL CO.**
Civ. No. 3530.

United States District Court
E. D. Louisiana, New Orleans Division.
Jan. 21, 1954.

Raymond H. Kierr, Samuel C. Gainsburgh, New Orleans, for plaintiff.

Terriberry, Young, Rault & Carroll, William E. Wright, Walter X. Connor, New York City, for defendant.

WRIGHT, District Judge.

Plaintiff, an American seaman, claims to have been injured on May 8, 1951 while employed as a member of the crew of the Esso Annapolis, a tank vessel owned and operated by the defendant. He asks damages under the Jones Act,[1] wages until the end of the voyage, and maintenance. His claim is based on a heart condition which he alleges was brought about by the negligence of the defendant.

Before May 8, 1951, plaintiff had been in the defendant's employ continuously since 1946 and periodically for about twenty years prior thereto. On the occasion of joining each ship operated by the company, plaintiff was subjected to a routine medical examination performed by the defendant's physicians, and three years before the incident in question, an electrocardiograph test was made on plaintiff's heart by the defendant with negative results.

On May 8, 1951, plaintiff, while attempting to remove a large rusty nut from a bolt in the same condition, suffered a heart attack. He was detached from the ship on May 9 in Baton Rouge, Louisiana, and was admitted the following day to the Marine Hospital in New Orleans. On May 13, 1951 while in the hospital he suffered a second attack, more severe than the first though related thereto in the opinion of the medical experts who testified. From the time of his admission to the hospital on May 9th until June 7, 1951, he was given

1. 46 U.S.C.A. § 688.

the usual treatment for coronary thrombosis, which treatment consisted primarily of sedation. Plaintiff remained as a patient in the Marine Hospital until June 29, 1951. Thereafter and up to the time of the trial, he has been an outpatient. Because of plaintiff's age, 66, and the present condition of his heart, it is now clear that he is permanently disabled. He will never recover from his heart condition, though he may be kept alive for several years by the use of digitalis which he is now taking.

On June 7, 1951 a representative of the defendant's claim department called upon the plaintiff in the Marine Hospital and presented to him for execution a document purporting to be a release of all claims of the plaintiff against the defendant, which release the plaintiff signed. One hour before signing the release plaintiff had been administered an opiate known as "papaverine", one of the effects of which is sedation. He had received similar opiates almost daily since his admission to the hospital.

At the time plaintiff signed the release he was presented with a booklet outlining the defendant's "Disability Benefit Plan" referred to in the release. He was not, however, furnished a copy of the "President's letter", also referred to in the release, nor was he advised of his legal rights under the Jones Act or the general maritime law. In fact, the defendant's representative admitted that he himself did not know what the plaintiff's legal rights were.

The plaintiff, while never urging too strongly his Jones Act claim, contends most earnestly that he is entitled to maintenance and cure at least up until the time of trial. Defendant, on the other hand, maintains that the release it holds from plaintiff is valid and that plaintiff has been paid according to the plan outlined in the release. In the alternative, defendant asserts that in any event plaintiff reached maximum cure within five months of his initial heart attack on board the Esso Annapolis, and since he has received under the release plan the equivalent of the maintenance to which he would be entitled up to that time, the defendant owes him nothing.

The release signed by the plaintiff is clearly invalid. From time immemorial the courts have sought to protect seamen against overreaching on the part of their employers and improvidence in themselves. The Congress itself has taken cognizance of the situation by declaring that release of claims for wages by seamen must be signed before a United States Shipping Commissioner, 46 U.S. C.A. § 644, and even when so signed, the seaman may, upon good cause shown, ask any court having jurisdiction to set aside such release. 46 U.S.C.A. § 597.

With reference to releases other than for wages, the courts have set their own standards. In Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 the Supreme Court held that releases signed by seamen are subject to careful scrutiny and that one who claims a seaman has signed away his right to what in law is due him must be prepared to take the burden of sustaining the release as freely made and fully comprehended by the seaman. To be valid under the Garrett case, a seaman's release must be made with full understanding of his legal rights and "the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding." Garrett v. Moore-McCormack Co., supra, 317 U.S. at page 248, 63 S.Ct. at page 252; Bay State Dredging & Contracting Co. v. Porter, 1 Cir., 153 F.2d 827.

█ Applying the above standards to the present case, we have here a seaman lying in a hospital bed suffering from a heart attack, drugged with opiates, without legal advice of any kind, or even the advice of a friend, signing away all claims of any nature he might have against the defendant. The defendant's representative who obtained the release admitted that he did not know what the plaintiff's legal rights were, although his superior in New York testified that all such representatives are fully informed

as to seamen's legal rights and are instructed to advise the seamen thereof before obtaining releases.

These circumstances alone would make the release invalid. It is, however, void for other reasons as well. The release provides: "I hereby accept the promise of Esso Shipping Company to pay me benefits during my disability, in accordance with the following schedule, under the Disability Benefit Plan of the Standard Oil Company (New Jersey) and participating affiliates; and the accompanying President's letter." At the time the release was taken from the plaintiff he was given a copy of the Disability Benefit Plan but not of the President's letter. The Disability Benefit Plan in its very first sentence provides: "This Disability Benefit Plan is adopted in order to provide for accident and sickness disability benefits for eligible employees beyond those payable by law." If the plaintiff had been given a copy of the President's letter he could have read therein, if he were in condition to read, the following language: "These benefits are payable in accordance with the provisions of the Disability Benefit Plan, provided the employee gives the company a full and complete release of any right he may have to sue." So it would seem that in one of the documents referred to in the release the seaman is told that the release relates to benefits beyond those payable by law. This document he received. In the other document referred to in the release, the seaman is told that if he signs the release, he can't sue the company for anything. This document he was not given. And to make the confusion complete, the President's letter also provides: "If any payments are due under the federal seamen's law, in excess of those under the Company's Benefit policy as outlined in this letter, the Company will meet fully the requirements of the law." It is not indicated however, who will determine when the company has met "fully the requirements of the law."

It is true that the plaintiff during his years with the defendant company had executed releases similar to the one in suit on two prior occasions. There is no proof, however, that he was any more advised of his legal rights at the time he signed those releases than he was at the time he signed the one in question here. As a matter of fact, it comes in poor grace for the defendant to urge such releases in support of its position since the evidence from its own representative shows that unless an employee signs such a release he is no longer an employee of the company. Perhaps this company policy was instrumental in obtaining the prior releases, if not indeed the one in suit. Moreover, this policy is in the teeth of the spirit, if not the letter, of the Congressional policy as outlined in 45 U.S.C.A. § 55, which says that any contract or "device whatsoever" the purpose or intent of which is to enable the operator to exempt itself from any liability created by the Jones Act shall to that extent be void.

█ The release being invalid, the plaintiff's claims must be considered First as to the Jones Act, it is clear that the plaintiff has no claim. In fact, it is not seriously urged. No negligence whatever is shown on the part of the defendant which contributed to plaintiff's condition. The plaintiff was simply doing ordinary seaman's work and the exertion brought on his first heart attack. While the Jones Act is to be liberally construed in favor of the seaman, no court has yet held that it is in effect a workmen's compensation statute, and the Congress itself, since the passage of the Jones Act has rejected any such theory of compensation for seamen, presumably on the recommendation of representatives of seamen themselves.[2]

█ With reference to his claim for maintenance, the seaman stands on firmer ground. He is entitled to maintenance until he has been cured or until his sickness or incapacity has become per-

2. Hearings before the House Committee on Merchant Marine and Fisheries, 76th Cong., 1st Sess. on H.R. 6726 and H.R. 6881.

manent. The former uncertainty as to the duration of seamen's claims for maintenance has been clarified by the promulgation by the President, after ratification by the Senate, of the draft convention of the General Conference of the International Labor Organization at Geneva, Article 4, Paragraph 1, of which provides: "The shipowner shall be liable to defray the expense of medical care and maintenance until the sick or injured person has been cured, or until the sickness or incapacity has been declared of a permanent character." 54 Stat. 1693. That this treaty has now become the law of the land is recognized by the Supreme Court in Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850, in which the Supreme Court states that while Article 4, Paragraph 1 of the convention is controlling on the question of maintenance, it is but a restatement of existing principles.

The medical testimony shows that the plaintiff suffered a heart attack on board the Esso Annapolis on May 8, 1951 and a further compromise of the heart on May 13th, while in the Marine Hospital in New Orleans. It is clear, therefore, that he fell sick in the service of his ship. Consequently, he is entitled to maintenance. The fact that his disease is incurable and not directly caused by his service as a seaman, but by the aging process, does not militate against his claim. Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107; Farrell v. United States, supra.

The duration of the maintenance to which plaintiff is entitled presents a more difficult problem. There can be no question but that his disabling heart condition is permanent and that it was so from the time he suffered his attacks on May 8 and 13, 1951. Under Article 4, Paragraph 1 of the convention, maintenance stops when the seaman's incapacity "has been declared of a permanent character." Does this mean that plaintiff's right to maintenance ended on May 13, 1951? Or does the obligation to provide maintenance continue until maximum recovery from a permanent incapacity is reached? A strict interpretation of the article would deny plaintiff maintenance beyond May 13, 1951, but the Supreme Court in the Farrell case has held otherwise, without discussing the point here presented. Consequently, plaintiff is entitled to maintenance until he reaches maximum recovery from his heart attacks of May 8 and 13, 1951.

With reference to maximum recovery from heart attack, plaintiff relies heavily on Gibson v. United States, D.C., 100 F.Supp. 954, affirmed, 3 Cir., 200 F.2d 336. In Gibson, the seaman suffered a coronary thrombosis, as did the plaintiff here. However, in Gibson, unlike the plaintiff here, the seaman was not permanently disabled. After an interval of five years, he returned to his work as a seaman, and the court allowed him maintenance during that interval on the theory that the curative process was going on during the five years he was incapacitated. Here the seaman's disability is admittedly permanent. He can never return to sea. It is true that from time to time he may be in need of medication, or even hospitalization, for his heart condition, but to allow him continuing maintenance, perhaps for the rest of his life, because of this possibility would be to do exactly what the Supreme Court in the Farrell case has proscribed.

The medical evidence varies as to the time when the plaintiff reached maximum recovery, the doctors for the defendant estimating as little as three months from May 8, 1951 and the doctors for the plaintiff estimating as much as two years. Considering these estimates as well as the other evidence available, the court fixes the time of maximum recovery as one year from May 8, 1951 and the rate at six dollars per day. Plaintiff is also entitled to his wages until the end of the voyage, June 8th, 1951.