Warner WILLIAMS, non compos mentis, who sues by and through his Committee, Myrvin M. L. Williams, Libellant,

v.

UNITED STATES of America, owner of THE NELSON W. ALDRICH, and Moore McCormack Lines, Incorporated, its agents, in personam, Respondents.

No. 7661.

United States District Court
E. D. Virginia, Norfolk Division.
April 19, 1955.

Jett, Sykes & Howell, Henry E. Howell, Jr., Norfolk, Va., for libellant.

Hughes, Little & Seawell, Harry E. McCoy, Jr., and Charles R. Dalton, Jr., Norfolk, Va., for respondents.

HOFFMAN, District Judge.

Libellant, Warner Williams, instituted this proceeding in admiralty, by and through his Committee, seeking damages, maintenance and cure from the respondents, United States of America, as the owner of the steamship Nelson W. Aldrich, and Moore-McCormack Lines, Incorporated, as agents of said vessel under a General Agency Agreement. The action was filed on March 30, 1954, more than two years and four months after libellant left the vessel. On exceptions filed by respondents, District Judge Albert V. Bryan, 133 F.Supp. 317, dismissed the action against Moore-McCormack Lines, and further dismissed the respondent, United States of America, from all claims other than for maintenance, cure, and damages for failure to provide maintenance and cure, arising within two years prior to the institution of the suit. The amended libel, filed by leave of Court, alleges that the United States failed to provide libellant with proper treatment and cure of his mental illness which had its inception aboard the vessel, and that libellant was committed to the Central State Hospital, Petersburg, Virginia, which institution did not fulfill the obligation for maintenance and cure and, in fact, so aggravated libellant's condition as to justify an award of damages arising within the two-year period prior to the institution of this suit.

Williams, a young Negro twenty-eight years of age, was one of twelve (or

thirteen)[1] children born in a rural area near Williamston, North Carolina. All of the evidence points to a normal family with no indications of insanity as to any other member. The testimony conclusively shows that libellant was normal in every respect when he signed on the vessel on or about September 17, 1951, as a "food handler" (Messman F. H.). Libellant was examined by Dr. Thomas M. Vorbrinck and passed as physically fit for duty on September 27, 1951. The vessel sailed for France and no unusual or peculiar actions on the part of libellant were noted on the voyage to Europe or during the brief stay in France. In fact, until the vessel was approximately one week out on its return voyage nothing unusual was observed by any of the crew members. At that time libellant obviously became afflicted with a mental ailment, the details of which are not pertinent, but which were known by the entire crew and the Master of the vessel. Upon arrival at Quarantine, a physician came aboard and examined the crew, but no report was apparently made as to libellant's mental condition. While the dates are not essentially pertinent, it appears that the vessel dropped anchor in the harbor of Hampton Roads late one Saturday; that one crew member secured from the Captain the address of libellant's family, went ashore, and caused libellant's father to be notified of his condition; that orders were posted not to permit libellant to leave ship and, on one occasion, libellant created a scene in an effort to board a launch taking crew members ashore; that the Captain left the vessel on Saturday night and was not seen thereafter until the crew (excepting libellant) were paid off by the Shipping Commissioner the following Monday at 11 A. M.; that libellant was aboard on Sunday morning and, while the evidence does not so disclose, was apparently successful in getting aboard a launch on that day; that libellant was taken in custody on Sunday at Newport News by local authorities and placed in the Newport News jail, the details of which were not revealed.

Allen Williams, libellant's father, arrived in Newport News on the Sunday night in question, but it was too late for him to see his son. He returned again on Tuesday but was told that he couldn't see libellant. The following Saturday he again made the trip from Williamston to Newport News and, while he indicated that he could not recall having seen his son on this occasion, he apparently signed the necessary papers to cause a hearing to be had on his son's mental condition. In any event, the father was then advised that libellant would be sent to an institution at Williamsburg or "some other place". The following week the lunacy commission regularly committed libellant, pursuant to the laws of the State of Virginia, to the Central State Hospital at Petersburg, Virginia—the only public or private institution available to Negro mental patients in Virginia. The evidence shows that, while libellant is the father of a young son living in North Carolina, libellant was a resident of Virginia for at least eight years before signing on the vessel, and hence Virginia is the proper state to have cared for him as a public charge.

For the purpose of this proceeding, the testimony clearly points to a complete abandonment of libellant by the shipowner after libellant went aboard the launch in the harbor. The respondent, United States of America, admits that it has done nothing since that date an insists that its duties are at an end. In answer to an interrogatory respondent states that it first learned of libellant's confinement at Central State Hospital during the latter part of March, 1952.

This brings us to a discussion of the tragic story of facilities for treating mental patients in Virginia. Undoubtedly this Commonwealth is not alone in its neglect of proper treatment for those

---

1. The Committee testified there were thirteen children. The father testified there were twelve children.

unfortunates traversing the valley of mental darkness. It is rather apparent to this Court that the science of medicine has outgrown the vast majority of states, and legislators have been unable to grasp the true situation by keeping abreast of the times. With the ever increasing population and the mental breakdowns caused, in a large measure, by the stress and strain of two World Wars, the 312 public institutions throughout our nation are unable to house—much less treat—the numbers seeking admission. It must be remembered that, before the more recent developments in the medical field, mental patients were sent to these institutions for the purpose of "existing" until God took them to their final resting places. It was largely a matter of attending to their physical needs with no thought of curative treatment. Only those families who were financially fortunate to afford the high costs of private mental hospitals could effectively substitute "hope" for "despair"[2].

From time immemorial the obligation to care for those mentally afflicted has been recognized as a public duty—one primarily resting upon the individual states. With the advent of electronic therapy, generally referred to as "shock treatments", patients were frequently discharged as "cured", while others reached a stage of "remission" which, while far from a complete cure, afforded the mentally ill an opportunity to mix again with the public and generally earn a sufficient sum to maintain themselves in life. Insulin inoculations inducing a twilight sleep were also discovered as a remedy for treating certain types of cases. More recently surgeons have developed an operation referred to as a lobotomy which, in effect, is a process of lifting sections of the skull and cutting into the brain; all of which results in a curtailment of the patient's emotional and physical reactions. In addition, since the argument

in this case, the Court has noted an interesting article appearing in Time magazine (March 7, 1955) involving the use of new drugs referred to as chlorpromazine and reserpine which have been very effective in certain types of schizophrenia cases. The following comment from this article is interesting:

"In the U. S., 300,000 schizophrenics fill about half the mental hospital beds, and after a stay of two years or so, their chances of being discharged have been slim indeed. The new drugs have already begun to change this".

The field of psychiatry is entitled to great credit in the developments thus far attained. While it is true that little can be done for some other than to provide for basic comforts, yet, with others, it is possible to stimulate interest in activities through a highly developed program of occupational therapy deemed essential to proper and adequate treatment. The psychiatric field is beset by shortages of trained personnel and lack of funds. Unless and until the governing bodies recognize the need of paying salaries sufficient to induce young men and women to enter this profession, as well as to compete with private institutions on a like basis, the problem will never be solved from a public standpoint. It is interesting to note that the United States Government pays $7 per day per patient to state institutions in Virginia for the care of mental patients on a temporary basis, whereas, in the instant case, Central State Hospital expends $1.94 per day per patient.

At the time of libellant's admission to the Central State Hospital his condition was diagnosed (November 27, 1954) as manic depressive psychosis. A subsequent diagnosis by a psychiatrist indicated a chronic undifferentiated schizophrenia reaction. All experts admit that, while there is no certain hope of cure

2. Ninety-six per cent of the mental patients in Virginia are confined to public institutions. Only four per cent have been able to secure treatment at private institutions.

or remission, there is an expectation of ninety per cent chances of improvement to the remission stage if patients are given proper and adequate psychiatric treatment within the first year following admission. All experts admit that the symptoms in the present case pointed to a diagnosis of schizophrenia, although they also state that a manic depressive psychosis could develop into a condition of schizophrenia. These same experts state that, after nearly four years of confinement, the chances of improvement in libellant's condition are approximately one in ten. Deep insulin inoculations and the lobotomy operation afford the only prospects of improvement under adequate psychiatric treatment, and, admittedly, the chances are slim unless the new drugs designated as chlorpromazine and reserpine will grant relief.

As previously noted, Central State Hospital is the only institution, public or private, available in Virginia to the mentally ill of the Negro race. The evidence reveals that conditions at Central State, while not on a par with public institutions available to the white race in Virginia, are generally comparable. The situation is aptly described by Dr. Joseph E. Barrett, Commissioner for the Department of Mental Hygiene and Hospitals, as "not one to brag about". In short, the man in charge of mental hospitals for the Commonwealth of Virginia admits that Virginia has completely failed in its obligations to the mentally ill, both white and colored.

The public institution available to Negroes in Virginia is sufficient, according to the evidence, to house 3398 patients. As of January 15, 1955, there were 4578 patients on hand, or an excess of 1180 over the rated capacity. During the period of libellant's confinement, the excess over maximum varied but, at all times, was at least 600 more than capacity. The physical facilities are not good and it is generally recognized that capital improvements to the existing structures are required—not only to take care of the excess, but also to modernize what already exists.

While the physical facilities are inadequate, the Court is not of the opinion that a correction of this neglect would tend to solve the problem. To care for the 4578 patients there are two psychiatrists [3], eleven regular physicians, nineteen registered professional nurses, three qualified clinical psychologists, *no* qualified psychiatric social workers, *no* qualified technicians and operators of the so-called "brain-wave" machine, and *no* qualified occupational therapists. According to Dr. Campden-Main, the minimum standards as designed by the American Psychiatric Association reveal the following comparisons as related to Central State Hospital to provide proper and adequate care for 4578 patients:

|  | Central State Hospital | American Psychiatric Association Minimum Standards |
|---|---|---|
| Qualified psychiatrists | 2 | 9 |
| Regular physicians | 11 | 45 |
| Nurses | 19 | 225 |
| Qualified occupational therapists | 0 | 40 |
| Qualified technicians | 0 | 1 |
| Qualified clinical psychologists | 3 | 15 |
| Qualified psychiatric social workers | 0 | 25 |

3. One psychiatrist is Dr. M. S. Brent, the Superintendent of the Hospital. The other psychiatrist is Dr. Brian C. Campden-Main, who was assigned to Central State in July, 1954, after one year of service at Eastern State Hospital, Williamsburg, Virginia. Prior to the arrival of Dr. Campden-Main, Dr. Brent was the only psychiatrist on duty and he also served as Superintendent.

This Court is not competent to fix the exact needs of personnel at Central State Hospital but, it is freely admitted by all that the present personnel, no matter how competent and industrious, cannot provide reasonably proper and adequate care. The evidence does not disclose any criticism of the existing personnel, nor of the treatment accorded libellant. It is the *lack of treatment* which is the subject of complaint in this case.

The institution in question is able, despite the lack of a qualified technician, to give patients the so-called "electric shock" treatments. It does not provide for insulin inoculations and, of course, a lobotomy operation is out of the question. Dr. R. Finley Gayle, Jr., a recognized authority on the subject, was called in behalf of respondent and, while he expressed doubt that more aggressive treatment would have aided libellant, he also stated that he would have used deep insulin treatments if the man had been his patient. He referred to the order of procedure as electric shock treatments to quiet the patient, followed by a period of watchful waiting to determine the results. If unsuccessful, the patient should have been given insulin and, as a final measure, a prefrontal lobotomy operation. A patient suffering from a schizophrenic condition admittedly requires a great amount of psychiatric care and occupational therapy to bring about a stage of remission or cure.

■ From the testimony adduced in the trial of this case, this Court can arrive at no other conclusion than that Central State Hospital is not, and was not in November, 1951, an institution which afforded libellant proper and adequate mental care.

The evidence discloses that in March, 1952, following a few shock treatments (referred to as insufficient in number), libellant was released on "furlough" in care of his brother. He was at liberty less than one week and was returned to the institution where he was then confined to Ward Six, known as the "chronic" ward. In the fall of 1952, he was given a series of shock treatments and, shortly after the institution of this action on March 30, 1954, he was subjected to another series of shock treatments. While the medical evidence indicates that libellant may have received additional shock treatments not recorded on his record, it appears that the first *series* of shock treatments took place in the fall of 1952, nearly one year following admission.

Other than electric shock treatments occasionally administered, there is no treatment afforded to the patients. They eat, sleep and sit—that is the routine day. In brief, if the shock treatments do not bring forth favorable results, the patients wait to die. At the request of relatives or other parties in interest they are sometimes released for treatment in other institutions and it is the contention of counsel for libellant that the respondent was duty bound to request libellant's transfer to the United States Public Health Service Hospital at Lexington, Kentucky, where the facilities are described as "adequate" to care for mental patients. In fact, it is urged that libellant would have been sent to the latter hospital had the shipowner taken libellant to the United States Public Health Service Hospital at Norfolk. This, however, is not substantiated by the evidence. Dr. Zinn, the medical officer in command at the United States Public Health Service Hospital at Norfolk, read into the record the regulations relating to the handling of mental patients. Insane and disturbed neuro-psychiatric patients are transferred to the Public Health Service Hospital at Lexington, Kentucky, with the absolute right to transfer such patients to state mental hospitals. Pending transfer to a Public Health Service or non-service mental hospital (state institution), Public Health officials are advised to have the case adjudicated locally for commitment of mentally incompetent persons. The consent of the patient's parents, guardian, nearest relative or friend

is sought, and where the patient has a legal residence in that particular state, inquiry should be made to ascertain whether that state (Virginia in this case) is willing to assume custody. It thus appears probable that, in the case of this libellant, Central State Hospital would have been the place of commitment in any event. This statement is subject to the qualification as stated by Doctor Zinn to the effect that no patient would be transferred to a state institution if the Public Health Service officials had knowledge of the completely inadequate facilities and personnel as revealed by the evidence herein, but Doctor Zinn further stated that the Central State Hospital had not been "blacklisted" as a place of confinement, although he conceded that if Public Health Service knew of the facts presented in this case, it was highly improbable that other mental patients would be sent to Central State Hospital except on a temporary basis.

This brings us to a consideration of what this Court deems to be the determining factor in this case, that is, the doctrine of foreseeable circumstances. If the Public Health Service Hospital had initially received libellant as a patient, it is unlikely that he would have been transferred to Lexington, Kentucky; in fact, the evidence indicates that he would have been sent to Central State Hospital. Such being the case, why should the shipowner, admittedly derelict in its duty to libellant, be required to anticipate that Williams would receive inadequate treatment at a mental institution recognized and maintained by the Commonwealth of Virginia? To impose a duty of investigation upon the shipowner in such a case would carry with it a burden greater than that contemplated by law. Mentally ill patients present a problem to all families, but it must be noted in this case that libellant's father signed the commitment papers with knowledge of the fact that his son would be sent to a state institution. Until and unless the inadequate facilities and personnel at Central State Hospital were brought to the attention of the shipowner by competent proof, the respondent shipowner should not be required to assume the contrary. General Electric Co. v. Rees, 9 Cir., 217 F.2d 595.

It is conceded by counsel for all parties that no authority has been found to meet the factual situation presented. In Rodgers v. United States Lines Co., 4 Cir., 189 F.2d 226, 229, the Court allowed damages for failure to treat the injured seaman, and said:

"The employer is under a duty to provide ordinary and reasonable but not extraordinary medical care."

In The C. S. Holmes, D.C., 209 F. 970, a somewhat similar situation arose with respect to the master of a vessel sending a seaman to an incompetent physician who was, however, licensed by the State of Washington. In holding for the shipowner, the Court said that, in the absence of knowledge of the incompetency of the physician, the master could presume that reasonable medical care would be afforded. While the case at bar is more flagrant by reason of the shipowner's abandonment of libellant, the reasoning appears to be the same in principle. The very nature of the disease may raise an inference that extraordinary medical care was required, but this must be considered in light of the standards generally available throughout Virginia. It is well settled that the shipowner is not held at his peril to effect a cure. Murphy v. American Barge Line Co., 3 Cir., 169 F.2d 61; Loverich v. Warner Co., 3 Cir., 118 F.2d 690, certiorari denied 313 U.S. 577, 61 S.Ct. 1104, 85 L.Ed. 1535; Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993.

The late Justice Jackson in Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850, likened the duty of the master (as representing the shipowner) to a seaman for maintenance and cure to that of a parent to his child. Other authorities state that the employer occupies a position of guardianship where

the injury occurred on board ship and the master was aware of it before the seaman left the vessel. Cortes v. Baltimore Insular Line, Inc., 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368; Murphy v. American Barge Line Co., supra. If this be the true analogy, then what could the parent in this case (Allen Williams) do for his child (the libellant) under the peculiar facts herein presented? It is conceded that no complaint as to inadequate treatment was indicated until proctors for libellant addressed a letter to respondent in October, 1953 (some five months prior to the institution of this action), and it is extremely doubtful that respondent would be required to conduct an investigation as to conditions at Central State Hospital based entirely upon a letter from counsel.

It is an accepted fact that no particular conditions on board the ship attributed in any degree to libellant's mental ailment. The claim is in failing to render proper care to libellant. It is in the nature of an "aggravation" to the existing disease. The question of aggravation is very indefinite and its extent is probably not susceptible of proof in any event. What the end result would have been had libellant been sent to the Public Health Service Hospital at Lexington, Kentucky, is, at best, speculative. The question is further compounded by the ruling of District Judge Bryan in applying the statute of limitations and limiting libellant's claim, if any, to maintenance and cure, and damages for failure to render maintenance and cure, arising within two years prior to the institution of this action. An interesting discussion of the proof required in such cases is noted in Godbout v. Eastern Steamship Lines, Inc., D.C., 82 F.Supp. 467.

As the master of a ship is not required to possess medical knowledge necessary to enable him to diagnose the ailments of a seaman, it is difficult to conclude that the master or shipowner could reasonably foresee that a state-supported mental institution would be as inadequate as the evidence in this case so clearly reveals to be the situation at Central State Hospital. The Monongahela, D.C., 70 F.Supp. 403; Pittsburg S. S. Co. v. Palo, 6 Cir., 64 F.2d 198; Cadle v. United States, D.C., 65 F.Supp. 288.

Counsel for both parties rely upon Spellman v. American Barge Line Co., Inc., 3 Cir., 176 F.2d 716, reversing D.C., 76 F.Supp. 1. In that case Spellman became mentally ill while on board the vessel. The master delivered to Spellman (a woman) a "hospital ticket" and paid transportation from Evansville, Indiana, to Louisville, Kentucky, by bus. Spellman apparently never reached the hospital but was located two days later in her home town in West Virginia. She was bruised about her body and was diagnosed as suffering from dementia praecox, catatonic state. After treatment she was discharged with a "guarded prognosis" and the testimony indicated that the two days of wandering, together with her slight injuries to her person, had aggravated her illness. At the time of trial she was described as being in a state of "partial remission".

The Circuit Court of Appeals for the Third Circuit held that, in mental cases, the giving of a hospital ticket and bus fare did not discharge the obligation of the shipowner, and that it was the further duty to afford safe transportation in cases involving mental disorders.

This Court finds no reason to dissent from the Spellman decision. If the libellant herein had been injured or met death by reason of respondent's failure to perform its duty, respondent would be required to answer in damages. Similarly, if any evidence had or could be produced showing an aggravation from the time libellant left the vessel until libellant was committed as insane, the doctrine announced in Spellman would be controlling. However, all parties admit that the libellant herein required treatment in a mental institution and the ultimate question resolves itself to the duty, if any, of a shipowner to investigate as to the adequacy of a state-supported institution of this type. In the judgment of this Court, such a rule would impose an undue hardship on ship-

owners and could readily be carried to an extreme. The claim for damages for failure to provide proper maintenance and cure is accordingly dismissed.

Little need be said with respect to maintenance. There is no contention that libellant's physical condition has suffered. He has been provided maintenance, presumably at the expense of the Commonwealth of Virginia. There is no evidence that libellant, or any person legally liable for his support, has been called upon to pay the expenses of his care, treatment and maintenance in Central State Hospital as provided by the Code of Virginia, Sec. 37–125.1. This is a matter between the Commonwealth of Virginia and the respondent herein. The obligation for maintenance rests upon the respondent and neither the libellant, his estate after death, nor any person legally liable for his support may be called upon to pay and, if demand is made, it is for the respondent to answer. It may well be that the Commonwealth of Virginia would be limited to a claim for maintenance in any such action. While proctors for libellant have endeavored to show the character of food served aboard the vessel Nelson W. Aldrich and have requested the Court to compare the cost per patient at Central State Hospital, this is no guide to follow in fixing maintenance. The rule of maintenance is a substitute for room and board, all of which has been provided. Libellant's claim for maintenance is disallowed.

Approaching the question of cure, a different problem is presented. The respondent is now on notice of the fact that Central State Hospital is inadequate. It may well be that libellant has reached a point of maximum cure, but the evidence does not so indicate. While the liability for maintenance and cure does not extend beyond the time when the maximum cure possible has been effected, there must be a reasonable showing of adequate treatment to convince the Court that such point has been reached. Farrell v. United States, supra. The respondent, in the light of this opinion, will probably conclude to bring about the transfer of libellant from Central State Hospital to an institution providing proper and adequate care. The care and treatment there afforded the libellant should be the maximum reasonably possible under the circumstances. If the respondent does not elect to transfer libellant, the effect of such a decision may give rise to further litigation.

Let a decree be prepared by proctors for respondent and, after appropriate inspection by proctors for libellant, be presented to the Court for entry in accordance with this opinion, which is adopted by the Court as its findings of fact and conclusions of law.