Joseph James **CARLENO**, Libellant,

v.

**MARINE TRANSPORT LINES, INC.** and **United States of America,** Respondents.

No. 8173.

United States District Court
E. D. Virginia,
Norfolk Division.
Oct. 29, 1962.

3. 33 U.S.C.A. § 905.

4. 33 U.S.C.A. § 903(a) (1).

Jacob Rassner, New York City, Israel Steingold, Norfolk, Va., for libellant.

Seawell, McCoy, Winston & Dalton, Charles R. Dalton, Jr., Norfolk, Va., for respondents.

WALTER E. HOFFMAN, Chief Judge.

Libellant instituted this action against Marine Transport Lines, Inc., as operator, and the United States of America, as owner, of the USNS Muir Woods, for damages allegedly resulting from the negligence of the operator, the unseaworthiness of the vessel, and the purported failure to provide medical care thereby aggravating libellant's condition. Respondent, Marine Transport Lines, has paid all maintenance from the inception of the illness on June 12, 1958, to and including December 18, 1958, at which time libellant was declared fit for duty. Libellant contends that he is entitled to

maintenance for an extended period beyond that date.

On May 13, 1958, libellant was employed as a boatswain aboard the vessel. He underwent the customary pre-employment physical examination and was determined to be free from disability. On June 8, 1958, the vessel left Savannah, Georgia, en route to Aruba, West Indies. At Aruba the vessel was to take on fuel and then proceed to a rendezvous with the United States Navy fleet off the coast of Portugal and there to effectuate a fuel transfer operation. Prior to leaving Savannah a shipyard had installed additional manifolds and other special equipment for the foregoing purposes.

While the vessel was at sea between Savannah and Aruba, libellant was ordered by the chief mate to cause certain hoses to be connected with the additional recently installed manifolds. The purpose of this operation was to expedite the later fueling activities to take place off the coast of Portugal. The ship's master testified that he wanted the work completed before arrival in Aruba in order that the vessel would remain gas-free, thereby eliminating any danger of fire in dragging the hoses over the deck while taking on fuel oil at Aruba or thereafter, but it is apparent that there was no real emergency existing. The evidence supports the view that the rigging of hoses to manifolds aboard tankers is customarily done by the deck crew, under supervision of the bosun, and there was nothing particularly unusual about the job in this instance, even though it was performed in extremely hot weather. The libellant admitted that he needed no special instructions in the performance of the work, although he had earlier testified that it was the first time he had done this kind of work.

In his capacity as bosun the responsibility for choosing the particular method to accomplish the work was left to the libellant. It was his final decision as to how many men would be needed and there were six men, plus libellant, assigned to the job.

In his discretion rested the determination as to what equipment would be used. It is conceded that the vessel had aboard all of the equipment used on tankers of this type for the moving of heavy articles, including booms, winches, whips and handie-billys, all of which were in good condition. True, the booms were not rigged and, according to libellant, could not have been prepared in time. Libellant did not elect to use the ship's winches because of the danger of breaking something, but he admits that he could have rigged a whip or a fall and there is evidence to the effect that handie-billys were actually used.

Libellant concedes that he had six men available to do the work. When asked how many men he thought he needed he responded somewhat evasively, first indicating that for some jobs there is never enough help, and later estimating that the entire deck department of ten men would have been adequate. He did not object to the work order, the type of equipment on hand, the number of men available, or the time within which to complete the assigned work. The preponderance of the evidence points to the fact that from three to six men could perform the work without too much difficulty, even if no mechanical devices had been employed.

The duties of a boatswain are primarily of a supervisory nature which do not require the performance of manual labor. Nevertheless, bosuns do engage in work requiring varying degrees of physical effort, all of which is generally done on a voluntary basis to suit the bosun's convenience. His chief function is to lay out the work and to supervise its performance. Consequently, prior to June 11, libellant had not done any appreciable physical work which could be related to his subsequent heart attack.

Some initial preparation was completed by the bosun's work gang on June 10, the day he received his work order. The actual work of moving the hoses commenced at 1 P.M. on the following day and was completed in approximately four hours. Although not required to

perform manual labor, libellant apparently worked along with the other members of the deck department selected by him for this job. After supper that evening libellant went to the storeroom for the purpose of "straightening up a deck locker," and worked voluntarily on an overtime basis for three hours. He stopped working around 9 P.M. when he commenced feeling ill. This was apparently the initial onset of his illness, although he thereafter testified that he did not experience any symptoms of his illness until sometime between 3 A.M. and 4 A.M. the following morning, and this is the information he gave to the physicians who examined him. At that time he awakened with shooting pains in his chest, nausea, and heavy sweating. He went to the purser, who served as the ship's medical officer, and, after taking his pulse and temperature,[1] the latter diagnosed his condition as a respiratory infection. Libellant was given 250 milligrams of terramycin—an antibiotic—told to put on a heavy sweatshirt, and sent back to bed. He was instructed to remain in his cabin until the ship docked several hours later and arrangements could be made to secure medical attention. At this time the vessel was entering or about to enter the Port of San Nicolaas, Aruba.

The purser immediately reported to the officer on watch and chief mate that libellant was not fit for duty until further medical attention was given to him. At approximately 7:30 A.M., when the vessel had docked or was about to dock, the purser went to check on the libellant and found him in the messroom drinking coffee; his appearance was improved and, according to libellant, he was feeling "a lot better." Libellant was given a pass to enable him to see the ship's agents in Aruba and was told to go to the Marine Office, a distance of 200–300 yards away from the vessel. No assistance was offered and none was requested, but libellant was accompanied by another seaman, Ranke, who was in need of treatment for his eye. After visiting the offices of the ship's agents near the pier, libellant and Ranke walked approximately one mile to the office of Dr. Dussenbroek during which time libellant again felt ill. He saw the doctor at some time between 10:30 A.M. and 11:30 A.M. The Dutch physician diagnosed his condition as a kidney ailment and recommended hospitalization. Subsequently it was discovered that libellant had suffered a heart attack although, prior to June 12, 1958, libellant had experienced no difficulty with his heart, chest, lungs or respiratory system.

On his return trip from the physician's office libellant met the purser who looked at the letter from Dr. Dussenbroek recommending hospitalization. The purser told libellant to go back to the ship and pack his gear. Libellant then took a taxi back to the ship, paying for it with money given to him by Ranke. His fellow crew members packed his clothes and carried his gear while he went through Customs and on to the Marine Office. He was then sent by taxi to the hospital where his true condition was ascertained. He was 46 years of age at the time of his attack and has been following the sea for 15 years.

Libellant remained in the Marine Hospital in Aruba from June 12 until July 28 when he returned by air to New York. For a period of approximately one week he was under treatment in the United States Public Health Service Hospital in New York. He then came to Norfolk and was an outpatient at the Marine Hospital until he was discharged as "fit for duty" on December 18, 1958.

Libellant returned to the Muir Woods in the early spring of 1959, where he served as bosun for a period of four to five weeks until the vessel was withdrawn from service. He later served about 50 days as an ordinary seaman aboard the Marine Pioneer. During the year 1961 he was employed as a bosun aboard the SS IKE for two consecutive voyages consuming a total period of ap-

1. The pulse rate was about 66; the temperature was approximately 96.6.

proximately six months. He was then advised to give up his work as a seaman.

■■ There is no substantial controversy as to the facts or applicable law. Aside from the serious question as to whether physical exertion may cause or contribute to a heart attack, the facts of this case will not permit a recovery predicated upon either negligence or unseaworthiness. There was no improvident order; there was no command that the libellant participate in the required manual labor; there was no improper or unsafe place to work; there was no breach of any duty; there was no shortage of manpower; there was no lack of adequate and properly maintained equipment with which to do the work; the ship's owners and officers had no knowledge of any pre-existing heart disease before the libellant undertook the task of moving the hoses. In short, unless there is an existing guarantee on the part of shipowners to respond in damages for a heart attack to a seaman aboard the vessel, there can be no recovery for negligence or unseaworthiness. While it is argued that a bosun's duty is sedentary and does not call for manual labor, even though it may be assumed that the ship's officers observed libellant performing manual duties in assisting in moving the hoses, there was no duty upon the officers to order the libellant to desist. It is certainly not reasonably foreseeable to anticipate that one required to resort to physical exertion in hot weather is a likely candidate for a heart attack, especially when the seaman has had no prior ailments or disabilities. To so hold would impose liability upon a shipowner in every case in which an order is given to a seaman requiring physical exertion and which results in some form of illness. Admittedly the term "negligence" as used in the Jones Act, 46 U.S.C.A. § 688 has not been given a narrow or restricted meaning. Jamison v. Encarnacion, 281 U.S. 635, 640, 50 S.Ct. 440, 74 L.Ed. 1082, but the plaintiff is still required to go forward with evidence on the essential elements of a negligence action, i. e., the existence of a duty, the negligent violation of that duty, and the causal relationship of violation to the injury or illness. Gilmore & Black, The Law of Admiralty, § 6–36, p. 311. The legislative policy of the Jones Act has been to compensate only on the basis of proven fault, DeZon v. American President Lines, 318 U.S. 660, 672, 63 S.Ct. 814, 87 L.Ed. 1065, and this is true even though the Act is liberally construed in aid of its beneficent purposes. Cortes v. Baltimore Insular Line, 287 U.S. 367, 375, 53 S.Ct. 173, 77 L.Ed. 368, Norris, The Law of Seamen, § 650, p. 311.

■ That the weather was "a little rough" is of no consequence, conditions which are presumably normal for a ship at sea and, moreover, the nature of libellant's illness cannot be attributed to performing this work while the vessel was "rocking and pitching *a little bit.*" It is argued that the task of moving the hoses and rigging them to the manifolds should have been done in the Savannah shipyard prior to the vessel's departure but this contention is not supported by any evidence of custom along these lines.

In Lamon v. Standard Oil Co., D.C., 117 F.Supp. 831, a seaman, with no prior record of heart ailment, suffered a coronary occlusion "while attempting to remove a large rusty nut from a bolt in the same condition." In a Jones Act suit, after holding the release to be invalid, the court said:

"The release being invalid, the plaintiff's claims must be considered. First as to the Jones Act, it is clear that the plaintiff has no claim. In fact, it is not seriously urged. No negligence whatever is shown on the part of the defendant which contributed to plaintiff's condition. *The plaintiff was simply doing ordinary seaman's work and the exertion brought on his first heart attack.* While the Jones Act is to be liberally construed in favor of the seaman, no court has yet held that it is in effect a workmen's compensation statute, and the Congress itself, since the passage of the Jones Act

has rejected any such theory of compensation for seamen, presumably on the recommendation of representatives of seamen themselves." (Emphasis supplied)

The fact that the bosun was doing manual work, although not required to do so, is answered in Sperbeck v. A. L. Burbank & Co., D.C., 88 F.Supp. 623.

■ Libellant relies upon a number of authorities to the effect that a seaman does not assume the risk of injury he may incur while performing work aboard ship pursuant to orders. There is no dispute with this principle of law, but it is inapplicable here as there has been no contention raised as to assumption of risk or contributory negligence.

Since the libellant urges that the work order was improvident, we should perhaps examine briefly the authorities cited. In Walker v. United States, D.C., 102 F.Supp. 618, death was brought about by the master's order to jettison a torpedo net, where the manner of so doing was found to be inherently dangerous, with the result that the decedent was knocked overboard when the net fell upon him while working under same. United States v. Boykin, 5 Cir., 49 F.2d 762, stands for the principle that an order to perform work on deck during a heavy storm with high wind and seas and no lookout for large waves did, under the circumstances, amount to an improvident order where the decedent was washed overboard by a tidal wave and no effort was made to abate the speed of the vessel. Finally, in Kangadis v. United States, D.C., 121 F.Supp. 842, an order was deemed improvident where the seaman was directed to perform work by the more dangerous of two methods; the bosun having ordered the seaman to work on a mast about 30 feet above deck level, told to climb up the mast, and thereafter swing from the platform into a bosun's chair, rather than to occupy the chair at deck level and be hoisted up, which was the safer method where the ship was rolling and pitching. Each of the foregoing cases illustrates an ele-

ment of external danger implicit in carrying out the order. In the instant case it could not have been reasonably anticipated that the performance of manual labor would pose an inherently dangerous hazard to life and limb, especially when we learn that the number of men assigned were adequate to complete the job without the aid of any mechanical devices.

■■ It is, of course, true that insufficient manpower assigned to a job may constitute negligence, even though the ship has a full crew. And if the vessel is undermanned, it may be unseaworthy. The Magdapur, D.C., 3 F. Supp. 971; Gold v. Groves, 3 Cir., 182 F.2d 767; Bradt v. United States, D.C., 122 F.Supp. 190, aff'd. in part, reversed in part, on other grounds, 2 Cir., 221 F.2d 325. The evidence in this case does not reflect any lack of manpower and, as to the particular assigned task, the preponderance of the testimony is to the effect that the work could be completed by three to six men.

■ We place no importance on the fact that the libellant failed to request additional help. The lack of protest in a case of inadequate help will not, of itself, exonerate the employer, although this factor may be considered in determining whether the employer was negligent. Southern Ry. Co. v. Welch, 6 Cir., 247 F.2d 340.

■ It is vigorously argued that the respondents are, at the very least, liable for damages occasioned by aggravation in permitting the libellant to walk approximately one mile to the doctor's office. It requires no medical testimony to support the view that a man with a heart attack should not walk a block, much less a mile. It is not unlikely that the libellant may have aggravated his condition by going from his quarters to the messroom for coffee during the early hours of the morning in question; all of which was done contrary to instructions from the ship's medical officer. The purser diagnosed libellant's condition as a respiratory infection. Are the respondents

liable merely because he made an error of judgment? Several hours later a physician, undoubtedly more qualified than the purser, made a diagnosis of kidney ailment which was also erroneous. Are we to hold a shipowner liable for the erroneous judgment of a non-physician, where a like error is made by a practicing physician? The rule is stated in Sawyer v. California Tanker Co., D.C., 147 F.Supp. 324, 328–329, as follows:

"The law imposes an obligation to give reasonable medical treatment to an injured or ill seaman, and the vessel will not be held responsible for an error of judgment on the part of officers, if their judgment is conscientiously exercised with reference to existing conditions. The Van Der Duyn, 2 Cir., 1919, 261 F. 887. A ship's officer is not to be held to the same standard of skill as a professional medical man in matters of diagnosis and cure. Barlow v. Pan Atlantic S.S. Corp., 2 Cir., 1939, 101 F.2d 697."

We cannot agree with proctors for libellant who argue that a man complaining of chest pains and obviously sick must, of necessity, be diagnosed as having a heart attack or in danger of one. Particularly is this true when, several hours thereafter, libellant reported that he was feeling better.

The foregoing discussion avoids the necessity of determining the extent to which libellant's condition was aggravated by the walk to the doctor's office. All of the physicians are in agreement that there is no way of determining the extent or degree of aggravation. The question of aggravation in a case such as this is very indefinite and speculative. See: Williams v. United States, D.C., 133 F.Supp. 319, aff. 4 Cir., 228 F.2d 129, cert. den. 351 U.S. 986, 76 S.Ct. 1084, 100 L.Ed. 1499, rehearing den. 352 U.S. 860, 77 S.Ct. 26, 1 L.Ed.2d 71, and Godbout v. Eastern S.S. Lines, D.C., 82 F.Supp. 467.

On the issue of maintenance, we note that libellant was found to be "fit for duty" on December 18, 1958, following an examination by Dr. Henry approximately two weeks prior thereto when libellant was determined to have reached maximum cure. Some three or four months thereafter libellant returned to sea on the same vessel. The date on which the seaman is certified as "fit for duty" is one factor in ascertaining the time at which maximum cure has been effected, but such certificate is not conclusive. Labenz v. National Shipping and Trading Corporation, D.C., 153 F. Supp. 785; The Ipswich, D.C., 46 F.2d 136; Miller v. United States, D.C., 51 F. Supp. 924; Norris, The Law of Seamen, § 559, p. 178; Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850.

In Gibson v. United States, D.C., 100 F.Supp. 954, the seaman sustained a heart attack and, following hospitalization, was treated as an outpatient. Thereafter he was under the care of a heart specialist undergoing continuous treatment up until the time of trial. He received sedatives and other medication to relieve chest pains and other discomforts. Despite the reduction of pain and discomfort, there was no physiological improvement in his heart. He was never certified as "fit for duty" although he worked sporadically during part of the time between his release as an outpatient and the time of trial and, when the case came to trial, he had been permanently employed for sometime. He was paid his maintenance only up to the time of his release. In allowing maintenance to the date of his permanent employment, less the periods he worked in the interim, the court correctly held that his further treatment was "curative" within the meaning in Farrell v. United States, supra.

The Gibson case is heavily relied upon by the libellant. A person with a heart attack is probably never "cured" in the sense that his heart is as good as before the attack. He may live for years and never have a recurrence. It is recognized

that heart disease in a general sense is of a permanent nature, but the determinative factor with relation to liability for maintenance and cure is the time of maximum recovery possible from the disabling effects of a particular heart attack or attacks which were causally connected with the seaman's service aboard the vessel from whose owners the seaman seeks maintenance and cure. Thus, in Lamon v. Standard Oil Co., supra, the seaman suffered two successive heart attacks which were related. The seaman was hospitalized for seven weeks and thereafter treated as an outpatient until the time of trial. On this point the court said (117 F.Supp. 831, 833):

> "Because of plaintiff's age, 66, and the present condition of his heart, it is now clear that he is permanently disabled. He will never recover from his heart condition, though he may be kept alive for several years by the use of digitalis which he is now taking."

In Lamon the court distinguishes the Gibson case by pointing out that Gibson was not permanently disabled even though he underwent a curative process for five years before returning to work, whereas Lamon was permanently disabled to such an extent that he could never return to sea. In one, the curative treatment was directed toward recovery and not just to ease the discomfort of a permanent condition; in the other, subsequent treatment, if necessary, was merely to alleviate the effects of a permanently disabling condition.

Applying these principles to the facts of this case, when did the libellant reach the point of maximum recovery possible? In the absence of contrary evidence, the court must conclude that the date of December 18, 1958, is correct when we give proper weight to (1) the "fit for duty" certificate, (2) the testimony of Dr. Henry, and (3) the libellant's subsequent work record for two years thereafter.

Concluding as we must that the respondents are not liable under any of the causes of action asserted, the libel will be dismissed with costs.

Adopting this memorandum opinion in lieu of specific findings of fact and conclusions of law, pursuant to Admiralty Rule 46½, 28 U.S.C.A., proctors for the respondents may prepare and present, after opportunity for inspection and endorsement, an appropriate decree.