**BOBORICKEN v. UNITED STATES et al.**
No. 15001.

District Court, W. D. Washington, N. D.
Dec. 3, 1947.

Levinson & Friedman, of Seattle, Wash. (Edwin J. Friedman, of Seattle, Wash., of counsel), for libelant.

J. Charles Dennis, U. S. Atty., of Seattle, Wash., for the United States.

Bogle, Bogle & Gates, of Seattle, Wash. (Edw. S. Franklin, of Seattle, Wash., of counsel), for respondent Pacific Tankers, Inc.

LEAVY, District Judge.

I think I am prepared at this time to make a disposition of this case, and in doing so without hearing a closing argument of libelant, I do not mean to leave the impression that the problem is a simple or an easy one.

I tried to follow very closely the testimony as it was either given orally or read into the record here. I tried to evaluate the credibility of the witnesses when testifying by deposition, the reliability of their testimony as shown by certain definitely admitted facts, and, when orally testifying, by their general demeanor on the stand and their willingness to answer questions as to facts that were, or ought to have been, within their knowledge.

I announced at the conclusion of this three-day trial that I would have no hesitancy in making a finding of unseaworthiness, and after further examining exhibits in the case and reviewing my own somewhat extended notes on the testimony, I am more confirmed in that belief than ever, and I arrive at that conclusion even though we must give consideration to the fact that the war was still on; everybody engaged in the war effort was working under terrific pressure and the desire to win the war and to expedite all of the actions necessary to win it, were uppermost in the minds of most of the people. Yet the record of this ship, as shown by its own log as made, is a startling one. To me it seems it is inexcusable, even on the ground of patriotism, that this ship should ever have been permitted to leave port without its annual inspection and certificate. It had been built but a short time, but evidently built under war conditions, and evidently had been built defectively. Its first voyage

across the ocean was one that gave great trouble and it was towed into port.

The voyage in question is one that should have taken probably thirty days, allowing another thirty days for unloading cargo by reason of war conditions—sixty days at most. Actually it took seven or eight months.

The ship had not left port more than a few days until she began to develop major trouble, and from that time on, until she arrived at Pearl Harbor, where she came in by a six- or seven-day tow, as I recall the testimony, it was just a constant round of trouble. Everybody on the crew was seeking to remedy conditions, but conditions upon this ship and this voyage were deplorable even though we minimize some of the testimony. It was in the torrid zone. The trip was made under temperatures ranging from a hundred and eight or ten to a hundred and twelve to fifteen degrees daily, and the great trouble was in the engine room, where the testimony is undisputed that the libelant, an active member of that engine crew, was subjected to soot and fumes and heat and filth, improper food and lack of sleep, and it wasn't only for a few days before the ship put in at this little port—Eniwetok—but it was all the time.

At Saipan the Navy was unable to furnish mechanical help and supplies, and the great burden of remedying difficulties fell upon the engine-room crew. I could spend a great deal of time enumerating incidents to show such an awful condition that no human being should be subjected to—a living hell from the time the ship had its first breakdown until it reached Pearl Harbor—and this libelant was very active in performing services beyond the call of duty as a third assistant engineer, and later as a second-assistant engineer.

I observed him carefully upon the witness stand. I noted particularly the record that he made through high school, and the rapid promotions that came to him in this ship's service. He served upon three vessels, I think, before this, and here, at the early age of 22, he was a third assistant engineer and at the conclusion of the voyage he was second assistant engineer. He

put himself forward in the responsibilities that came his way by reason of the unseaworthiness of this vessel beyond that of his fellow crewmen. Those immediately superior to him became incapacitated at times, but he continued his work—continued it at Saipan, continued it when the ship went dead some 700 miles out of Pearl Harbor—and the working conditions never seemed to improve.

Now there is nothing in this record that I can find to support the conclusion that he was a well and healthy young man during the period in Pearl Harbor. He went ashore some, but there was no proof that he was living a careless, or carefree or dissolute life, or doing those things which a decent, ambitious, self-respecting young man would not, and should not, do. I am much impressed with his testimony and I give it great consideration, even though he has a deep interest in the outcome of this case.

His testimony was that at Pearl Harbor he began to feel ill effects from this tremendous strain that had been placed upon his physique in the months preceding; that he had a cold there, and that he always felt tired—not as he had before—which even the layman knows is one of the symptoms of tuberculosis.

In so far as competence and fitness and ability of the engine crew on this ship are concerned, I'm much persuaded to the view that this libelant was perhaps the most conscientious and competent man in the crew. The chief engineer, who appeared here in person, minimized certain bad conditions on the ship, but admitted others. He was making his first voyage on a ship across the Pacific as chief engineer. Doubtless if conditions had been other than those that prevailed during the war period, he would not have been assigned to this high responsibility.

Coming now to the question whether there is a sufficient causal connection between the hardships endured by the libelant growing out of the unseaworthiness of the vessel and his tuberculosis, I again, without hesitancy, find that there is such a connection. The Court, of course, cannot speak as the expert medical witness

does under circumstances such as we have here, but certainly this record supports a finding abundantly that this young man was in fine physical condition when he signed articles on this ship in September or October of 1945, and without again referring to the hardships endured and the overtime work—and there was substantial overtime—I am conscious of the exhibit that has been referred to in reference to overtime, but my recollection is that even the chief engineer testified to facts that tend to in part destroy the effective evidentiary value of those exhibits by stating that he did spread overtime.

The fact is there must have been periods when there was a great amount of overtime, because men, even indolent and indifferent, would not want to lie upon a sweltering sea three or four days without exerting their very best efforts to remedy a condition requiring this. Such is the situation that prevailed before the ship went into Eniwetok, and an ambitious young man, who had already gone ahead of the group in his class in his chosen field of work, would perhaps be more inclined to overdo than another, and that is just exactly what occurred here.

The meagre evidence that we have of the situation at Pearl Harbor indicates it was not one which was a period of vacation for the crew, because again there was that shortage that came with the war or immediately after the war in the matter of ship repairs, and this ship was not put in drydock nor not taken over by some concern who gave its full attention to repairing ships, but the help that was received from the Navy was, instead of major, I think, from the indications of the record here, say auxiliary and the major part of it fell on the crew—at least a good part of it.

However, when the vessel arrived in Seattle, there is no question of the terrific illness of the libelant. That's not disputed anywhere. There is some question whether it was the disease of pneumonia from which he was suffering, and that that in turn lighted up a latent tuberculosis, or whether is was a pneumonia that had been induced by a tubercular condition. The doctor who examined him most recently— and I may say that both the physicians for libelant and respondent are eminent in their field, I take it, I have never seen either to my knowledge, but I was impressed with their testimony,—but the doctor that examined him within a week or ten days of the beginning of this trial, and who likewise checked his hospital record, stated, and it's not disputed, that pneumonia is of some three or four well-known types, and that one recognized type is tubercular pneumonia. That the ailment of the libelant, when he was taken to the marine hospital, was that of a tubercular penumonit, which when the pneumonia features of it were checked, continued to progress as tuberculosis. So much, then, for that phase of the case.

Having found that there was an unseaworthy ship and that there is a causal connection between this unseaworthiness and the unfortunate condition of this young libelant, we come to the more difficult question as to what should be the measure of damages.

I am conscious of the fact that in fixing damages now and fixing damages ten years ago, the courts are warranted in taking into consideration the depreciated value of the dollar as a measure of damages, and daily we find jurors doing that very thing and the courts sustaining verdicts. On the other hand, I do not feel the situation is such as to return a judgment fixing liability in the sum that is sought in this libel.

The libelant has lost about a year and seven or eight months of earnings. He is going to lose another two years at the minimum. The testimony varies. The doctor called on behalf of the libelant says three years. The doctor from the Marine Hospital expressed no opinion. The doctor called by the respondent, I think, said a year or a year and a half, and further testified that, at the end of that time, this libelant could go back and resume his work. We all know as a practcal matter with one lung gone—completely lost, and there is no dispute on that—he will have to channel his ambitions in a line other than the one that he originally contemplated, and that he

is definitely, by reason of physical requirements in that field, out, in so far as being an engineer upon a merchant vessel, but he is not lost, as it might be contended, from other gainful occupations. He is an exceptionally intelligent young man. He is making a remarkable recovery from a terrible disease, and his future need not be so dark as some would think. He is still so young that he could train himself for some other career, and perhaps get as much or more money than he would get as an engineer or chief engineer.

He should be compensated for the loss in earnings that he is going to sustain during this period of disability, and while it is stated that there has been a twenty percent increase over the wage that he was getting after being promoted as second assistant, there is no reason to find, and I do not think the record would support a finding, that he would have been able to remain continuously as a second assistant after the war situation. He might have, but he more probably would have been back to a third assistant. The promotion to second assistant was a rather hurried one growing out of the exigencies of the journey. My recollection is that some one of his superiors stepped out of the picture.

I think an allowance for the loss of what appears to be about three and a half years of active life, two years in addition to the approximately year and a half he has been under treatment in the Marine Hospital, can fairly and safely be measured both to the libelant and the respondent by the sum of $12,000.

Now as to an allowance for pain and suffering, physical and mental, it's a matter that cannot be measured at all in dollars and cents. I am impressed that this young man has taken his misfortune with a higher degree of optimism than most do, and I commend him for it. He is going to be permitted to go to his home the 15th of next month and spend the two years there, and will receive his pneumothorax treatments and other directions from the Marine Hospital service there. I think I shall allow $3,000 on this latter item.

Then we come to what constitutes the second cause of action. Ordinarily, at this stage, there would not be a recovery, but the situation that presents itself here is quite different from those cases in which I so recently had the counsel here on both sides before me, where exceptions to the libel were filed, and I sustained the exceptions.

Here, definitely, the record is that this libelant is going to leave the hospital and become an outpatient, and he will be such for at least two years, and I don't think that it can be seriously contended that it would be any less time. In fact, I think the situation has become so common that many laymen know that, in the treatment of tuberculosis with pneumothorax procedures, it requires about that time. The Court itself has knowledge of several such instances.

He should be allowed an award not based upon what is calculated as the cost of keep on a ship, nor on the sum that he seeks, nor on a sum that would be allowed to a stranger who would go and live—I mean a person without a family—I should say, who would go and live with strangers. This boy, according to the testimony, is going to live with his parents, where he will be ever so much happier. They should not be burdened, of course, with his board and room and items of that kind, and some sum should be allowed that would meet such an expense. I shall allow $87.50 a month, from and after December 15, 1947, to and including December 15th, 1949. Costs will be allowed libelant. You may prepare and submit finding, conclusion of law and decree.