**Charles O'NEILL**

v.

**UNITED STATES of America,**
**United States Maritime Commission.**

**Nathan R. ALLTMONT**

v.

**UNITED STATES of America**
**United States Maritime Commission.**

**Nos. 287 of 1946, 287 of 1947.**

United States District Court
E. D. Pennsylvania.

Nov. 13, 1957.

194

- - - - ◇ - - - -

Milton M. Borowsky, of Freedman, Landy & Lorry, Philadelphia, Pa., for plaintiffs.

Henry J. Morgan, Asst. U. S. Atty., Philadelphia, Pa., Leavenworth Colby, Chief, Admiralty Section, Dept. of Justice, Washington, D. C., Rollins M. Koppel, Sp. Atty., Dept. of Justice, Washington, D. C. (now in Harlingen, Texas), for defendants.

VAN DUSEN, District Judge.

This is an admiralty action for personal injuries suffered by libellants (an able-bodied seaman and Chief Engineer, respectively) when a mine exploded under the stern of a merchant tanker (S. S. Cedar Mills) owned and operated by respondents as this ship was starting to leave the harbor of Ancona, Italy, on November 19, 1945.

### I. History of the Case

Although there was extensive litigation over certain discovery aspects of these cases prior to October 9, 1953,[1]

---

1. O'Neill v. United States, D.C.E.D.Pa. 1948, 79 F.Supp. 827, reversed sub nom.

Alltmont v. United States, 3 Cir. 1949, 177 F.2d 971, certiorari denied 1950, 339

no document filed by libellants, seeking discovery, appears in the Clerk's file in either case between that date and December 12, 1955, when libellants resumed their discovery efforts by filing additional interrogatories. In spite of this more than two-year hiatus in libellants' efforts to secure evidence which might be needed for trial and of several continuances granted to them in the fall of 1955 and winter of 1956,[2] libellants requested another continuance on May 21, 1956, when the case was reached for trial as the result of a special listing, in order to inform a recently-discovered expert of the facts on which they based their claim. The respondents strenuously resisted any further continuance on the grounds that libellants had had all the basic information necessary to prepare their case since 1949, the witnesses were becoming increasingly more difficult to locate, and the respondents' attorney handling the matter was moving to Texas during the summer so that he would not be thereafter available without considerable difficulty.[3] The court granted libellants' application for a continuance to the extent of postponing (a) the start of the trial for a week, until May 28, 1956, and (b) the taking of testimony of the expert witnesses until July 16, 1956.[4]

On the afternoon of July 18, 1956, at the conclusion of the respondents' expert testimony, libellants applied for leave to take rebuttal testimony at a later date after they had an opportunity to consult their expert witnesses (N.T. 1278 ff.). Respondents objected strenuously to the receipt of any additional testimony more than 24 hours after this Wednesday afternoon, since this week had been set aside for expert testimony, and requested the court to rule that, at the least, the libellants should be required to decide promptly (within 24 or 48 hours) whether they would offer additional testimony (N.T. 1284–5). In order to give libellants every opportunity to present their case,[5] the court granted libellants a month within which to consult their experts and apply to the court if they wished to offer rebuttal evidence by deposition (N.T. 1283–4). Respondents were given a week to answer libellants' letter, if written, requesting leave to take rebuttal testimony by deposition, with the understanding that they could also offer evidence by deposition after hearing libellants' rebuttal evidence (N.T. 1288).

By letter of August 10, 1956, libellants requested leave to offer additional testimony by deposition to be taken in Washington on September 17–18, 1956. Respondents objected, by letter of August 20, 1956, to the taking of such testimony, because of the absence of any "impelling circumstances." After some

U.S. 967, 70 S.Ct. 999, 94 L.Ed. 1375; cf. Alltmont v. United States, D.C.E.D. Pa.1951, 98 F.Supp. 309.

2. This case had been listed for trial on December 6, 1954, October 31, 1955, January 16, 1956, and April 16, 1956, at which time it was specially listed for May 21. The libellants had applied for, and been granted, a continuance "on the last two or three listings" (N. T. 6 of transcript of 5/21/56, see letters of 10/20/55 and 12/29/55 in Clerk's file).

3. See N. T. 5–13 of transcript of 5/21/56. Although the respondents' attorney did leave Government service and move to Texas in the summer of 1956, he returned to Washington for the depositions taken in December 1956 but was not available for the deposition taken in May 1957, as explained more fully below. On October 9, 1953, the Government had filed with this court the statements of potential

witnesses which libellants had been trying to secure in the proceedings mentioned in footnote 1 above.

4. See testimony of 5/21/56, N. T. 14, 24, 25–6, for the ruling of the trial judge. Although the libellants requested a continuance until the fall of 1956 or July 1956 (N. T. 2 of transcript of 5/21/56), the court had civil jury trials listed for July 1956 and no non-jury trial list during that month, and it would have been impossible to try the entire case in the single available week of July 16. Counsel for respondents stated that he was satisfied with the trial judge's ruling (see N. T. 27 of transcript of 5/21/56).

5. No explanation has ever been given as to why "another witness" (N. T. 1279), presumably Mooers, could not be available the week of July 16, which was set for the taking of expert testimony.

further correspondence (see Exhibit A containing the above-mentioned two letters and the further correspondence), the depositions of libellants' experts were taken in December 1956, at which time additional expert testimony was offered by respondents and they requested leave to take the testimony of W. B. White, an expert in mine countermeasures and mine sweeping, if libellants would not agree to a summary of his proposed testimony to be assembled in an affidavit. As shown by the correspondence in Exhibit A, libellants would not agree to the affidavit of W. B. White and his deposition was finally taken in May 1957 and filed on June 28, 1957 (see Document No. 54 in Clerk's file, No. 287 of 1946).

Requests for Findings of Fact and Conclusions of Law were filed during August and September 1957, and the final brief (respondents' reply brief) was filed on October 9, 1957.

For the information of persons studying the record, there were three separate written stipulations of fact filed during the trial, as follows:

1. Stipulation of Facts of May 1956, filed August 1, 1956 (Document No. 46 in Clerk's file, No. 287 of 1946).

2. Stipulation of Facts filed and dated 7/16/56, but docketed as filed 7/19/56 (Document No. 44 in Clerk's file, No. 287 of 1946).

3. Stipulation of Facts filed 12/6/56 (Document No. 51 in Clerk's file, No. 287 of 1946).

Oral stipulations of counsel were read into the record on July 16, 1956, including the following:

A. If a representative of the British Admiralty were called to testify, he would testify that the records kept by that Admiralty indicate that all of the mines laid in Ancona approaches and harbor were German ground mines (G. C.) and that the German G. C. mine was a general purpose ground mine which could be fitted with a variety of assemblies, and it is not possible to say which particular type of mine caused the loss of the S. S. Cedar Mills (N.T. 678).

B. This representative of the British Admiralty would also testify that there is a record of the explosion of a mine (type not specified) quite close to the position where the Cedar Mills was subsequently sunk and that this mine was exploded by an LL sweep undertaken sometime between July 19, 1944, and August 18, 1944 (N.T. 680).[6]

Evidence rulings on objections and motions made during the taking of the depositions are contained in Exhibit B attached hereto.

## II. Findings of Fact

The trial judge makes the following Findings of Fact:

1. Libellants' Requests for Findings of Fact numbered 1, 2 ("6184" should read "6134"),[7] 4, 5, 8, 9, 17, 23, 24, with the exception of the 5th sentence, 27, with the insertion in the third sentence, in place of the word "by," of the words "as 'not suited for military duty' by the doctor for" (see Exhibit L–31, p. 2, and N.T. 279), and with the deletion of all words after the word "consideration" in the third line from the end of that paragraph, 28, 30, and respondents' Requests for Findings of Fact numbered 9, modified to include the words "weighing 2000–2300 pounds and" after the word "mines" in line 2 and the words "at Ancona" at the end of the words in the parentheses,[8] 10, 11, 1,

---

6. It should be noted that the information concerning mine laying in the second and third lines on N. T. 680 is incorrect and the accurate information is contained in the Stipulation filed 12/6/56, mentioned above.

7. See Stipulation, par. 2, filed August 1, 1956 (Document No. 46 in Clerk's file, No. 287 of 1946).

8. The description of the German mines dropped by aircraft at Ancona and when they were dropped is contained in Stipulation filed 12/6/56. This document shows that on July 3, 1944, 12 such mines were dropped 155 yards apart in Ancona harbor and on July 5, 1944, 6 such mines were dropped 177 yards apart off Ancona harbor, whereas 3 mines were dropped

modified to add "(see N.T. 490 and the X in a circle on L–4)," 2, 3, 4, 5,[9] 6, 7, 8, modified by changing "several" to "two," 12, modified by inserting after the word "maximum" in line 3 the words "sound waves through vibrations of ship and," 13, modified by substituting the words "a contributing" for the words "an actual" in line 4 of paragraph 13, 14, 15, modified to include before the word "coarse" the words "somewhat more," 16, 17, 18, 19, and 20, modified by deleting the last sentence, are adopted as Findings of Fact of the trial judge.

2. Libellant O'Neill served aboard the S. S. Cedar Mills (hereinafter called "Cedar Mills") as an able-bodied seaman and libellant Alltmont served aboard that vessel as Chief Engineer.

3. At Gibraltar, before entering the Mediterranean Sea, the Master of the vessel received charts and routing instructions (R–1, L–2, L–3) which did not contain any statement about the advisability of degaussing, but did show that the vicinity of the port of Ancona was a danger area for mines and warned mariners to keep a good lookout for drifting mines at all times (par. 15 of L–2). Floating mines were seen on no more than two occasions in the Mediterranean and the Adriatic during the voyage of the Cedar Mills from Gibraltar to Ancona.[10] The degaussing system was in operation during this voyage until arrival at the port of Ancona.

4. On November 15, 1945, the Cedar Mills anchored in the Ancona harbor and swung from a bow anchor with the current and tide. The mean draft of the Cedar Mills while at anchorage (November 15 to November 18) was approximately 28½ feet.

5. After discharging fuel oil at the north mole on November 18 and 19, the mean draft of the vessel was approximately 23½ feet, the draft forward was 22 feet, 2 inches, and the draft aft was 25 feet (par. 1 of Stipulation docketed 7/19/56).

6. At the time the Cedar Mills left the dock, the current had a southeast set, three to four knots, and there was a slight northeast wind, with visibility one-and-a-half to two miles.

7. At the time of the explosion, the north mole was approximately broad on starboard beam of the Cedar Mills (N.T. 582) and the Cedar Mills was heading 30 to 50 degrees true.

8. The explosion of the mine under the stern of the vessel caused (a) a large crack in the ship's sides at the No. 5 tank approximately amidships, and (b) breaking of at least some of the engine room boilers or steam lines.

9. Both libellants were disabled as a result of this mine explosion. On March 19, 1946, libellant Alltmont was discharged from Staten Island (New York) Marine Hospital, fitted with a Taylor-Knight brace, and he continued under out-patient treatment until January 22, 1947, when he was discharged as fit for duty (see L–10—L–13). He was again disabled as the result of an aggravated hernia condition, which required an operation, from November 6, 1947, to December 10, 1947.

10. Libellants have not sustained the burden of proving, by a fair preponderance of the evidence, that the explosion was that of a mine having a magnetic element necessary for its detonation.[11]

---

the same day south of the south mole. The information in the preceding sentence was obtained by the British Admiralty from German sources and shows that additional mines were laid in the vicinity of Ancona in April and June 1944.

9. The large period made by Welsford on L–19 from which he drew a line to his initials, "FW," is the most accurate lo-

cation of the point of the explosion on any of the charts (N. T. 617–9), but this is only an approximate position.

10. The log showed one occasion (November 12) where the ship altered course to avoid a mine (N. T. 554, 620), but libellant Alltmont testified mines were seen on two occasions.

11. Libellants rely in their brief (pp. 15 and 16) on West v. United States, 3 Cir.,

■ 11. Assuming the failure to post a lookout on the bow, while the lines were being coiled and stored for the sea voyage, may have made the vessel unseaworthy, such unseaworthiness was not a substantial factor in causing (a) the injuries of libellants or (b) this underwater mine explosion. Also, even if the failure to have the degaussing equipment turned on in this harbor made the ship unseaworthy,[12] libellants have not sustained their burden of proving, by the fair preponderance of the evidence, that such unseaworthiness was a substantial factor in causing the injuries to the libellants.

12. Assuming the failure to post a lookout on the bow, while the lines were being coiled and stored for the sea voyage, may have been negligence, such negligence did not contribute in any part to (1) the injuries of the libellants or (2) this under-water mine explosion. Also, even if the failure to have the degaussing equipment turned on in this harbor was negligence,[12] libellants have not sustained their burden of proving, by the fair preponderance of the evidence, that such negligence did contribute in some part to their injuries.

13. Libellant O'Neill was an aggressive, hard-working boy with a higher than average I. Q. prior to World War II (N.T. 417). During the period between December 21, 1945, when libellant O'Neill arrived back in the United States (N.T. 277), and May 1955, by which time he had recovered from the disability caused by the explosion on November 19, 1945 (N.T. 377 and 424 ff.), libellant O'Neill lived at home during all periods of disability and had not contributed any amounts to his maintenance and care, except for, at most, a period of one week.[13]

---

1957, 246 F.2d 443, at page 445, but in this case the court said:

"* * * if a libellant cannot make out on the facts a case on which recovery can be granted, necessarily the legal problems disappear."

Libellants, in several places in their brief, argue that inferences be drawn from facts which they assume but which they have not sustained the burden of establishing by the fair preponderance of the evidence. For example, they assume that ships went back and forth in the harbor of Ancona during the period from July 1944 to November 1945 with degaussing equipment turned on, but there is no evidence in the record that the vessels using Ancona harbor had their degaussing equipment turned on or off. The only evidence on the point shows that the instructions issued to the Cedar Mills required the degaussing equipment to be on only "in the ports of Venice or Trieste." See respondents' Requests for Finding of Fact 3, adopted in paragraph 1 above.

12. The trial judge finds the degaussing equipment should not have been turned on in this shallow harbor on November 19, 1945. See respondents' Request No. 3, adopted in paragraph 1 above, and the Discussion below [157 F.Supp. 200]. For this reason, the failure to activate the degaussing was neither unseaworthiness nor negligence.

13. All the evidence in the record indicates that libellant O'Neill lived at home during the period between his being paid off in New York, approximately a week after arriving back in the United States, and sometime between his visit to Dr. Levine on November 26, 1954, and his visit to Dr. Levine on May 26, 1956 (N. T. 426). His constant references to going home are contained at N. T. 277, 278, and 288, where he said that for money during the period prior to June 1946 "I was depending on my people," 397, and 420–1. He went to New York on two occasions during the period between December 21, 1945, and the end of that month and he may have had to pay his own maintenance on these occasions, so that the finding of seven days' liability for maintenance is the most that is indicated by the record. This seven-day period would also cover any maintenance and cure to which this libellant might be entitled at the time of his wrist cutting in May 1953 (see Exhibits L–23 and L–23A, and N. T. 371–2), cf. Boboricken v. United States, D.C.W.D. Wash.1947, 76 F.Supp. 70, assuming (which the trial judge does not decide) that he was still entitled to maintenance and cure at that time in spite of his failure to go to the Philadelphia General Hospital for treatment in 1946 (see Finding of Fact No. 15 and Discussion, 157 F.Supp. 203 ff. below).

14. Libellant O'Neill suffered from an anxiety state (psychoneurosis) caused by the explosion under the Cedar Mills on November 19, 1945, but he had this condition under control as of the time of trial (May 1956) due to the favorable environment in which he was at that time. This anxiety state might be reactivated in the future by unfavorable environmental factors (N.T. 414 ff.).

15. Libellant O'Neill has failed to sustain his burden of proving that failure to secure psychotherapy treatment resulted from his indigence or from the failure of respondents to make Government-supported medical facilities available to him. The record indicates that his failure to secure psychotherapy treatment was due to his own unwillingness to request treatment at the Philadelphia General Hospital and that he may even have had sufficient funds to secure such treatment from a private physician.[14]

16. The libellant, Charles O'Neill, is entitled to seven days of maintenance and cure at the daily rate of $3.50, or a total of $24.50.

All Requests for Findings of Fact not mentioned in paragraph 1 above are rejected.[15]

### III. Discussion

The trial judge believes that there is no necessity to summarize the more than 1650 pages of testimony in this trial record. His Findings and Conclusions are based largely on the acceptance of the testimony of respondents' witnesses as being more accurate than libellants' witnesses. Welsford,[16] and to a lesser extent Bauer, was by far the most alert and accurate fact witness who took the stand. Mostow and Muzzey were by far the most accurate, best qualified, and most credible expert witnesses to appear before the trial judge. Mostow's elaborate and clear testimony persuaded the trial judge that the damage to the Cedar Mills on November 19, 1945, was caused by an under-water explosion under the after 100 feet of the ship, which resulted in not only the initial shock wave but also the often more damaging bubble pulse (or pulses) causing pitching, flexual vibration, and then heaving (collectively called a whipping motion).[17] Mostow's testimony conclusively refuted the testimony of libellants' expert Hinckley that the explosion was from a mine which touched the ship or from one which had an antenna that touched the ship.[18] For this reason, any negligence or unseaworthiness in failing to have a bow lookout posted prior to the explosion did not contribute in any degree to the injuries, since a lookout could not have seen a mine more than two fathoms below the surface.

Muzzey knew far more about German mines and their capabilities than libellants' witnesses. Muzzey and White (whose testimony was offered by deposi-

14. See the Discussion below [157 F.Supp. 204].

15. Although the libellants argue in their brief that the degaussing would have become effective in a matter of seconds after being turned on (page 3), libellant Alltmont, who admittedly knew more about the degaussing equipment on the Cedar Mills than anyone else on the ship, testified that it might take five minutes to get the degaussing equipment up to the required amperes (N. T. 51). The Captain was just about to have the degaussing equipment turned on when the explosion occurred.

16. His receipt of a commendation medal from the Maritime Service for his performance on this occasion (N. T. 632–3) is consistent with the clear and credible testimony he gave from the witness stand.

17. See similarity between damage shown in Exhibits R–8 and R–18 (known damage from under-water explosion). See, also, R–7; cf. R–23 and 24.

18. In addition to basing his testimony on the movements of the Cedar Mills and the known damage to its hull, the absence of (a) any signs of plumes, domes or splashes of water (see R–26 & 27) and (b) of any extensive holes above the water line was also relied on by Mostow as proof of an under-water explosion. Hinckley himself was apparently convinced, since his rebuttal testimony indicated that he agreed with Mostow that a ground mine's under-water explosion had caused the damage.

tion) collectively knew more about mine sweeping than libellants' witnesses, Hinckley and Mooers. On the basis of Muzzey's very able testimony, the trial judge has concluded that:

1. There was no negligence or unseaworthiness involved in failing to have the degaussing equipment turned on in the shallow water where the explosion occurred, since (a) the degaussed signature[19] of the Cedar Mills would have detonated a magnetic ground mine, and (b) the activation of degaussing would have resulted in a magnetic mine being detonated nearer the hull (thereby doing greater damage) than would have been true if the ship was not degaussed (N.T. 1234-6 and 1520 ff.).

2. Even if the degaussing should have been turned on and paragraph 1(b) above is incorrect, libellants have not sustained their burden of proving that this failure to have the degaussing activated contributed in some part to the explosion, since the degaussed signature of the Cedar Mills was sufficient to activate the 5-10 milligauss setting of the

magnetic element in the combination magnetic-acoustic German general purpose mine (N.T. 1196).

On the basis of the testimony of Mostow, Muzzey, Gaetano and White,[20] the trial judge concludes that:

1. It is most probable that all magnetic mines had been cleared from this part of Ancona harbor by the constant sweeping conducted by the British from July 1944 to November 1945 (N.T. 1494-5, Exhibit B to Stipulation of May 1956).

2. The mine causing this explosion was most probably either an acoustic ground mine or a combination acoustic-magnetic ground mine (N.T. 1495 ff.), which was only activated because of the large volume of high and low frequency sound waves resulting from this full speed ahead, hard left rudder, maneuver as the ship was starting out of the harbor (see respondents' Request for Finding of Fact No. 3, adopted in Finding of Fact No. 1 above; N.T. 573).[21]

19. The degaussed and undegaussed signatures of the Cedar Mills at the depths stated below are (N. T. 1428, 1449 ff.):

| Depth | Undegaussed | | Degaussed |
| --- | --- | --- | --- |
| | Bow | Stern | |
| 40' | 172 mg | 187 mg | 75 to 85 mg |
| 42' | 158 mg | 171 mg | 65 to 74 mg |
| 45' | 140 mg | 152 mg | 53 to 60 mg |
| 48' | 128 mg | 138 mg | 44 to 45 mg |

20. White was experienced in British and American mine sweeping techniques. He testified persuasively concerning the great difficulty of sweeping acoustic mines in 1945 (N. T. 1602-9). It was most difficult to sweep a combination magnetic-acoustic mine (N. T. 1636). A magnetic mine at this location in Ancona harbor was relatively easy to sweep and the British sweeps would have effectively detonated it (N. T. 160 ff.).

21. Because the mine was unswept by relatively effective magnetic sweeps and had probably (a) become submerged in the muddy bottom (e. g. N. T. 1412, 1572, 1574, 1586, 1626, 1632), (b) had its microphone's carbon granules jarred on landing into a "sleeper" condition (N. T. 1245-6), and (c) a weakened battery due

to the length of time since it had been dropped, it probably had an acoustic mechanism and there were more than the ordinary problems involved in detonating it (e. g. N. T. 1199-1203, 1496-8). During the last war, great difficulty was experienced in sweeping German acoustic mines, since sound waves of a certain duration, amplitude, frequency and rate of rise were required for detonation (N. T. 1202). Libellants' expert Hinckley admitted that if an acoustic mine was sunk in the mud, it was less apt to be detonated (N. T. 698 and 1412). Also, he admitted that he could not say that a German microphone battery could not have been operational in a mine at Ancona harbor in November 1945 (N. T. 1379). Muzzey testified that one in every

The testimony of libellants' expert Hinckley is of limited usefulness, since he admittedly had no knowledge of the setting of German mines (N.T. 1349–1352) or of the British sweeps under operational conditions (N.T. 1342 and 1386). Also, their expert Mooers had no knowledge of the type of German mines used at Ancona (N.T. 1457) and admitted that if the German mine was set at less than the degaussed signature of the Cedar Mills (44 to 85 milligauss), then the degaussed "ship will probably activate the mine" (N.T. 1473).[22] In view of this lack of Mooers' qualifications, his answers to hypothetical questions are of very little weight (N.T. 1441 ff.).[23]

The legal principles applicable to this record and the Findings of Fact of the trial judge are:

A. The libellants have failed to sustain their burden of proving respondents are liable on either the ground of unseaworthiness or the ground of negligence.

■ The libellants have not sustained the burden of proving, by the fair preponderance of the evidence, that any unseaworthiness or negligence existed[24] which contributed in any part to the injuries. See Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 32–33, 64 S.Ct. 409, 88 L.Ed. 520; Eckenrode v. Pennsylvania R. Co., D.C.E.D.Pa.1947, 71 F.Supp. 764, 768, affirmed 3 Cir., 1947, 164 F.2d 996, affirmed 1948, 335 U.S. 329, 69 S.Ct. 91, 93 L.Ed. 41; cf. Rogers v. Missouri Pacific R. Co., 1957, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed. 2d 493.[25]

■ The evidence in favor of libellants on the liability issues does no more, at best, than raise a doubt in the fact finder's mine which he is unable to resolve. It has been consistently held that the party having the burden of proof must do more than raise a doubt in the mind of the fact finder. See Thomas Roberts & Co. v. Calmar S. S. Corp., D.C.E.D.Pa.1945, 59 F.Supp. 203, 207; Burch v. Reading Co., 3 Cir., 1957, 240 F.2d 574, 579,[26] certiorari denied 1957, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed. 2d 914; Commercial Molasses Corp. v.

---

three acoustic mines laid at Ancona in June and July 1944 would have a battery which would be active in November 1945 (N. T. 1500 ff. and 1530; cf. 1553 and 1221).

22. The magnetic settings used in these mines in 1944 were 5–10 milligauss (N. T. 1239, 1482, 1498–1500; respondents' Requests for Findings of Fact 11 and 13, adopted in paragraph 1 above). The lack of weight attributable to the testimony of Mooers is referred to in Exhibit B, p. B.

23. It is also noted that constant interruptions of cross-examination of these expert witnesses during the depositions by counsel for libellants (e. g. N. T. 1396, 1416, 1450 ff., 1474) might well make the United States Court of Appeals for the Third Circuit feel that their testimony should be disregarded, due to the denial to respondents of their right of effective cross-examination. See United States v. Fontana, 3 Cir., 1956, 231 F.2d 807, 810–811; United States v. Hogan, 3 Cir., 1956, 232 F.2d 905, 906–907. However, the trial judge has considered the testimony of these experts of libellants.

24. As pointed out above, the only unseaworthiness or negligence which the trial judge finds is the failure to post a bow lookout. Libellants have not sustained the burden of proving that failure to have the degaussing turned on at the time and place is negligence.

25. These cases make clear that recovery under 46 U.S.C.A. § 688 (see Brown v. C.D. Mallory & Co., 3 Cir., 1941, 122 F. 2d 98 as to applicability of the Jones Act in this suit) is only proper if libellants establish both negligence and that such negligence contributed in some part to the injuries.

26. In this case, the court said, 240 F.2d at page 579: "If, as the trial judge suggested in his charge in this case, the evidence merely raises a doubt in the jurors' minds as to whether or not the facts asserted by the plaintiff are true or if in their minds the probabilities of those facts being true or false appear equal the plaintiff has not met his burden of proof and a finding for the plaintiff would be inconsistent with the jurors' duty to render a true verdict."

New York Tank Barge Corp., 1941, 314 U.S. 104, 112, 62 S.Ct. 156, 86 L.Ed. 89.

The libellants' primary contentions have been that negligence contributing in part to, and unseaworthiness causing, the explosion consisted of (a) the failure to post lookouts and (b) the failure to turn on the degaussing mechanism. The trial judge rejects contention (a) because the evidence overwhelmingly shows an under-water explosion from a mine which could not have been seen by lookouts, even if they had been posted. Contention (b) is rejected because of libellants' failure to sustain their burden of showing, by the fair preponderance of the evidence, either that failure to have the degaussing equipment on at the time and place of the accident was negligence or unseaworthiness, or that such failure (even if it were unseaworthiness or negligence) contributed in any part to the accident, since the degaussed signature of the Cedar Mills was sufficient to detonate a German combination magnetic-acoustic mine of the type involved here even if such mine was the type involved in this case. Unless the mine which was detonated at Ancona harbor contained a magnetic element, contention (b) cannot be sustained. Libellants have, at most, raised a doubt in the trial judge's mind on this fact issue.

Furthermore, since the same facts which support the inference that a mine with a magnetic element was present support equally the inference that a mine with an acoustic element only was present, the libellants have not sustained their burden of proof.[27] See Pennsylvania R. R. Co. v. Chamberlain, 1933, 288 U.S. 333, 339–340, 53 S.Ct. 391, 77

L.Ed. 819; Kehoe v. Commissioner, 3 Cir., 1939, 105 F.2d 552, 555, reversed on other grounds [28] Helvering v. Kehoe, 1950, 309 U.S. 277, 60 S.Ct. 549, 84 L.Ed. 751; McAllister v. United States, 2 Cir., 1953, 207 F.2d 952, 954; Stirk v. Mutual Life Insurance Co. of New York, 10 Cir., 1952, 199 F.2d 874, 877.

B. Maintenance and cure

1. *Libellant O'Neill*

Since libellant O'Neill was furnished maintenance and cure by his family during his periods of disability prior to May 1955 (see Finding of Fact No. 13 above) and since he had no disability between May 1955 and the time of trial (May 1956), he is only entitled to maintenance and cure for one week, as stated in the above-mentioned Finding of Fact No. 13. It has been consistently recognized that a seaman is not entitled to maintenance and cure during the period that he has lived at home with his family. Johnson v. United States, 1948, 333 U.S. 46, 50, 68 S.Ct. 391, 92 L.Ed. 468; Stolper v. United States, 1950 A.M.C. 551 (E.D.Pa.1950); Nunes v. Farrell Lines, Inc., D.C.D.Mass.1955, 129 F. Supp. 147.[29]

2. *Libellant Alltmont*

Libellant Alltmont was disabled from the time he left the Public Health Hospital in the New York area on March 19, 1946, until January 22, 1947, when he was given a "fit for duty" classification (see Exhibit L–11). He was also disabled as the result of this explosion which activated a pre-existing hernia condition, which required surgery, from October 27, 1947, to November 6, 1947 (see Exhibit L–14). He was disabled

---

27. The trial judge recognizes that he is entitled to draw the most reasonable inference from the circumstantial evidence presented by this record, but the difficulty with libellants' contention is that the inference that the explosion was caused by an acoustic mine is just as reasonable as the inference that it was caused by a combination acoustic-magnetic mine.

28. In this case, the court said, 105 F.2d at page 555: "The law is clear that if facts give equal support to each of two inconsistent inferences, judgment must go against the party that has the burden of proof."

29. Cases such as Boboricken v. United States, D.C.W.D.Wash.1947, 76 F.Supp. 70, where the family had to perform nursing services for the sick seaman while at home, are distinguishable from this record, where there is no evidence that the libellant was not ambulatory during his periods of disability (cf. footnote 13 above).

after this surgery from November 6, 1947, to December 10, 1947.

He is entitled to maintenance and cure for these two periods—namely, 310 days and 34 days, respectively, or a total of 344 days.

C. Liability for consequential damages resulting from failure to pay O'Neill maintenance and cure.

 It is clear that a shipowner is liable for any damages resulting from his failure to provide maintenance and cure promptly, where he was given notice that such maintenance and cure was required and the seaman was unable to procure proper care due to indigence. Sims v. United States, 3 Cir., 1951, 186 F.2d 972; Graham v. Alcoa S. S. Co., 3 Cir., 1953, 201 F.2d 423, 425. Libellant O'Neill contends that the filing of the libel in this case on December 11, 1946, gave respondents notice that he required psychiatric medical treatment for his mental condition.[30] He was advised by the representatives of the respondents to go to a doctor about this condition when he signed off in December 1945, but did not do so because he thought it would pass off (N.T. 277–8). This libellant applied for "medical help" for the care and cure of his anxiety state (see Finding of Fact No. 14) in 1946, prior to his original examination by Dr. Levine on September 10 of that year. He was advised by the Public Health Service to go to the Philadelphia General Hospital, but he did not do so for these reasons (N.T. 421):

"He didn't want to consider himself a charity case, and he had a lot of feeling about being considered a mental case. It was for these reasons that he avoided seeking any specific help."

The record also indicates that libellant was paid approximately $500 when he was paid off in December 1945 (see Amended Answer to Requests for Admission No. 8, filed 11/4/55). He had also earned the following amounts between December 1945 and the time he filed his complaint in 1946, alleging that the refusal of the respondents to furnish him maintenance and cure had aggravated his anxiety state:

| | |
|---|---|
| Board of Education, April 1946–July 1946 | $290.55[31] |
| Philadelphia Record, September 1946–January 1947 (17 weeks x $22.00; see N. T. 293) | 374.00 |
| Total | $664.55 |

30. Paragraphs 5, 6 and 8 of the Libel contain this language:

"* * * as a result of which libellant became mentally and physically affected. Respondent thereafter failed and refused to provide prompt and adequate medical attention and required him to return prematurely to the United States, as a result of all of which libellant's mental condition was aggravated and prolonged and he sustained the injuries which are hereinafter more specifically set forth.

* * * * *

"* * * repondents * * * were careless and negligent and the vessel was unseaworthy in:

* * * * *

"(j) failing to provide libellant with proper and adequate medical care, attention, treatment and maintenance for the alleviation and cure of libellant's condition;

"(k) compelling libellant to make the return trip to the United States while still suffering from the effects of his nervous breakdown and nervous condition, thereby aggravating his mental condition;

* * * * *

"* * * By reason of the negligence of the respondent * * * libellant suffered a nervous breakdown; his nervous system became impaired; he became subject to nightmares and insomnia; he has suffered vague feelings of inexplicable fear with extensive perspiration and depression; he sustained a severe anxiety psychoneurosis; * * * he has in the past and will in the future, be compelled to expend large sums of money for medicine, medical care and treatment, * *."

31. Paragraph 9 of Amended Answers to Requests for Admissions, filed November 4, 1955.

During the year immediately after his return to the United States, when he was most in need of medical care for his anxiety state, this libellant had available to him approximately $1,164.55 ($664.55 plus $500). There is no evidence whatsoever in the record that he failed to get the psychotherapy recommended by Dr. Levine (N.T. 415) because of lack of funds.[32]

Under the authorities binding on this court, it seems clear that this libellant is not entitled to recover the consequential damages he claims for at least two reasons:

(a) He has not shown that his indigence prevented him from getting the necessary psychotherapy. He was living in Philadelphia and there is no showing that he did not have sufficient carfare to get to the Philadelphia General Hospital. In fact, he may well have had sufficient funds to secure psychotherapy treatment from a private doctor, as there is nothing in the record to indicate how often he would have had to go for the out-patient treatment recommended by Dr. Levine (N.T. 415).

(b) Hospital treatment was recommended to him, both in December 1945 by the representatives of the ship owner and by the Public Health Service sometime in 1946, prior to his first examination by Dr. Levine (N.T. 421). The Philadelphia General Hospital was fully available to him and he declined to take advantage of this for reasons of his own.

■ The cases have consistently held that a seaman's right to maintenance and cure is forfeited by voluntary rejection of hospital care on his part (see Luth v. Palmer Shipping Corp., 3 Cir., 1954, 210 F.2d 224, 228, and cases there cited). It seems to have been consistently recognized that a seaman is not entitled to reject free services available from Government maintained hospitals (such as those maintained by the Public Health Service or the Philadelphia General Hospital, supported by the City of Philadelphia) without showing that the treatment available there is inadequate, and there is no such showing in this record. See The Bouker No. 2, 2 Cir., 1917, 241 F. 831, certiorari denied 1917, 245 U.S. 647, 38 S.Ct. 9, 62 L.Ed. 529, cited with approval in The Balsa, 3 Cir., 1926, 10 F.2d 408, and Murphy v. American Barge Line Co., 3 Cir., 1948, 169 F.2d 61, 63, certiorari denied 1948, 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406.

32. The record shows that this libellant earned the following amounts from January 1947 to May 1955, when he established the very favorable employment with the photo-engraving company which continued at the time of trial (N. T. 377):

| | |
|---|---|
| Photo Copy Company, 4/1947–6/1947 | $ 249.39 |
| Art Loom Co., 10/1947–11/1947 | 85.02 |
| Deweys', Inc., 5/1948 | 17.50 |
| Pioneer Suspender Co., 5/1948–6/1948 | 148.67 |
| Publicker Industries, 9/1948–10/1948 | 124.07 |
| Sun Shipbuilding Corp., 11/1948–12/1948 | 312.79 |
| Sun Shipbuilding Corp., 1949 | 2,498.15 |
| Sun Shipbuilding Corp., 1/1950–4/1950 | 518.24 |
| Publicker Industries, 7/1950–12/1950 | 1,762.49 |
| Publicker Industries, 1/1951–3/1951, 6/1951, 8/1951–9/1951 | 1,276.31 |
| United Parcel Service, 11/6/51–11/19/51 | 75.27 |
| Publicker Industries, 6/1952–8/1952 | 496.95 |
| Oscar Mayer & Co., 9/24/52–12/1952 | 731.22 |
| Oscar Mayer & Co., 1/1/53–5/22/53 | 1,243.41 |
| Publicker Industries, 6/1953–12/18/53 | 1,609.54 |
| Publicker Industries, 4/15/54–8/30/54, 9/9/54–11/30/54 | 2,342.23 |

See Requests for Admissions filed 4/6/55 (Document No. 34 in Clerk's file, No. 287 of 1946) and Answers to these Requests filed 5/6/55 and 11/4/55 (Documents Nos. 35 and 36 in that file).

### IV. Conclusions of Law

The trial judge makes' the following Conclusions of Law:

1. Libellants' Requests for Conclusions of Law Nos. 1 and 2, and respondents' Requests for Conclusions of Law Nos. 1, 2 and 4 are adopted as Conclusions of Law of the court.

2. Neither the failure of the respondents, and their agents, servants or employees, to have the degaussing equipment of the vessel turned on at the time and place of the explosion in question, even if this should have constituted negligence, nor their failure to post lookouts, even if this should have constituted negligence, contributed in any part to the injuries suffered by the libellants.

3. Neither the failure of the respondents, and their agents, servants or employees, to have the degaussing equipment of the vessel turned on at the time and place of the explosion in question, even if this should have constituted unseaworthiness, nor their failure to post lookouts, even if this should have constituted unseaworthiness, was a substantial factor in causing the injuries suffered by the libellants.

4. The respondents are not liable for any consequential damages to the libellant, Charles O'Neill, on the alleged ground of failure to supply him maintenance and cure promptly in the form of psychotherapy.

5. The libellant, Charles O'Neill, is entitled to recover $24.50 for maintenance and cure, together with interest at 4% from December 11, 1946, and costs, without prejudice to his right to claim maintenance and cure for any period after June 1, 1956, in another action.[33]

6. The libellant, Nathan R. Alltmont, is entitled to recover $2,236 for maintenance and cure, together with interest at 4% from December 10, 1947, and costs, without prejudice to his right to claim maintenance and cure for any period after June 1, 1956, in another action.

Libellants may submit an appropriate order for the entry of judgment in each of the above cases, after sending it to respondents for such comments as they may care to make on the form of the proposed order.

### Exhibit B

Rulings on Objections to Evidence Made During the
Taking of Depositions (N. T. 1305–1624)

| Page No. | Ruling |
| --- | --- |
| 1305 | Objection overruled, with comment that the answer has very little, if any, weight due to the witness' admitted lack of familiarity with German mines (N. T. 1349, 1351-2, 1365, 1387, 1389, 1399) and his admitted lack of familiarity with British mine-sweeping techniques in general (N. T. 1380)[a] and, in particular, with the sweeping done at Ancona from July 1944 to November 1945 (N. T. 1342). |
| 1308 | Objection overruled. (See comment re 1305.) |
| 1309 | Objection overruled. (See comment re 1305.) |

---

33. It may well be that if this libellant fails to go to the Philadelphia General Hospital for treatment after the lengthy discussion of this matter at the trial (week of May 28, 1956), it would be very difficult for him to secure maintenance and cure in the future.

a. The witness' only experience with mine sweeping was in the simplest terms (N. T. 1396).

| Page No. | Ruling |
|---|---|
| 1314 | Objection overruled. (See comment re 1305.) |
| 1318 | Objection overruled. (See comment re 1305.) |
| 1334 | Objection withdrawn by objecting counsel, interrupting with his own question. |
| 1337 | Objection overruled. |
| 1376 | Objection overruled. |
| 1378 | Objection overruled. |
| 1410 | Objection overruled. |
| 1411 | Objection overruled. |
| 1412 | Objection overruled. |
| 1414 | Objection overruled. |
| 1440–1443 | Objections overruled with important qualification that answers have little or no weight in view of (a) the fact found by the trial judge that the milligauss setting of German magnetic mines dropped in Ancona harbor was 5 to 10 milligauss and witness based his answer on milligauss setting of 25 to 75, and (b) witness' admitted lack of knowledge of German mines and British Mine Sweeping techniques.[b] |
| 1447 | Mooers Exhibit 3—Objection sustained as this document not properly proved under any of the exceptions to the hearsay rule. |
| 1444a–1448 | Objections overruled, with important qualification that answers have very little weight for the reasons given in connection with the previous ruling and the fact that the hard left rudder could well have resulted in the bow not passing over the same area which the stern passed over. |
| 1457 | Objection overruled. |
| 1474 | Objection overruled. |
| 1477 | Objection overruled. |
| 1487 | Objection overruled. |
| 1490 | Objection overruled. |
| 1492 | Objection overruled and motion to strike denied. |
| 1494 | Objection overruled. |
| 1496 | Objection overruled. |
| 1499 | Objection overruled and motion to strike denied. |
| 1502 | Objection overruled. |
| 1545 | Objection sustained. |

b. Mooers testified as follows at N. T. 1456: "I was primarily concerned with degaussing, most certainly, and I did peripheral work with sweeping; but my information in connection with mines was only most fragmentary and the laboratory at times, was reluctant to even give much information on milligauss settings for mines. We were given certain targets, in terms of milligauss values, but the explanation of those targets tended to be withheld."

| Page No. | Ruling |
|---|---|
| 1547 | Objection overruled. (Last objection overruled solely to permit rebuttal to cross-examination at N. T. 1539–40; motion to strike denied for same reason, as counsel for libellants brought up the question and referred to the book at 1539.) |
| 1549 | Objection overruled. |
| 1551 | Objection overruled. |
| 1552 | Objection overruled. |
| 1553 | Objection overruled. |
| 1559–6 | Objection overruled. |
| 1563 | Objections overruled. |
| 1565 | Objection overruled. |
| 1573 | Objection overruled. |
| 1574 | Objection overruled. |
| 1575 | Objections overruled. |
| 1582 | Objections sustained. |
| 1583–4 | Objections sustained. |
| 1603 | Objection sustained. |
| 1609– 1624 | All objections overruled. |